`

115 T.C. No. 30

UNITED STATES TAX COURT

J. C. SHEPHERD, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2574-97.                    Filed October 26, 2000.

P transferred to a newly formed family partner-
ship, of which P is 50-percent owner and his two sons
are each 25-percent owners, (1) P's fee interest in
timberland subject to a long-term timber lease and
(2) stocks in three banks.

<u>Held</u>:  P's transfers represent separate indirect
gifts to his sons of 25 percent undivided interests in
the leased timberland and stocks.  <u>Held</u>, <u>further</u>, the
fair market value of petitioner's gifts determined.

<u>David D. Aughtry</u>, <u>James M. Kane</u>, and <u>Howard W. Neiswender</u>,
for petitioner.

<u>Robert W. West</u>, for respondent.

THORNTON, <u>Judge</u>:  Respondent determined a $168,577 deficiency in petitioner's Federal gift tax for calendar year 1991.  The issues for decision are:  (1) The characterization, for gift tax purposes, of petitioner's transfers of certain real estate and stock into a family partnership of which petitioner is 50-percent owner and his two sons are each 25-percent owners; (2) the fair market value of the transferred real estate interests; and (3) the amount, if any, of discounts for fractional or minority interests and lack of marketability that should be recognized in valuing the transferred interests in the real estate and stock.

Section references are to the Internal Revenue Code as in effect on the date of the gifts.  Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

The parties have stipulated some of the facts, which are so found.

Petitioner is married to Mary Ruth Shepherd and has two adult sons, John Phillip Shepherd (John) and William David Shepherd (William).  When he filed his petition, petitioner resided in Berry, Alabama.

<u>Petitioner's Acquisition of Interests in Land and Bank Stock</u>

Beginning in 1911, petitioner's grandfather--at first singly and later with petitioner's father--acquired a great deal of land

in and around Fayette County, Alabama. In April 1949, petitioner's grandfather died and left petitioner, his only grandchild, a 25-percent interest in all that he owned. Among the grandfather's possessions was an interest in more than 9,000 acres spread over numerous parcels in and around Fayette County, Alabama (the land), and stock (the bank stock) in three rural Alabama banks--the Bank of Parish, the Bank of Berry, and the Bank of Carbon Hill (the banks).

Prior to 1957, petitioner's father gave petitioner an additional 25-percent interest in the land, thereby increasing petitioner's ownership interest to 50 percent. As described in more detail below, on January 3, 1957, petitioner and his father leased the land to Hiwassee Land Co. (Hiwassee) under a 66-year timber lease. On June 2, 1965, petitioner's father died, leaving all his property--including his 50-percent interest in the land and an undisclosed amount of stock in the banks--to petitioner's mother. Petitioner's mother died shortly thereafter, devising to petitioner her 50-percent interest in the land and the bank stock. Petitioner then owned the entire interest in the land, subject to Hiwassee's leasehold interest. Petitioner also owned more than 50 percent of the common stock of the banks, of which he was then president.[1]

---

[1] The record does not specify when petitioner first became president of the banks.

Long-Term Timber Lease of Family Land

As described above, by 1957 petitioner and his father each owned a 50-percent interest in the family land. On January 3, 1957, petitioner and his father entered into a long-term timber lease with Hiwassee, granting Hiwassee the right to cut and remove timber on 9,091 acres (the leased land).[2] The term of the lease is for 66 years, expiring on January 1, 2023.

Hiwassee agreed to pay annual rent of $1.75 per acre, payable for each calendar year by February 1 of that year. The annual rent is to be adjusted each year by the same percentage as the annual average of the Wholesale Price Index for all commodities (now the Producer Price Index) (PPI) increases or decreases relative to the Wholesale Price Index for 1955. The annual rents are adjusted "only for increments of increase or decrease equaling or exceeding five percent (5%) from the 1955

---

[2] Bowater, Inc., is the successor in interest to the rights of Hiwassee Land Co. (Hiwassee) under the lease on the subject property. References to Hiwassee hereinafter also include references to Bowater, Inc., as successor in interest.

average or from the average resulting in the previous adjustment."[3]

Under the lease, the lessors retain all mineral rights on the land but must obtain the lessee's consent ("which shall not be unreasonably withheld") to develop the minerals.[4]

The lease allows the lessors to sell the leased land, subject to Hiwassee's right of first refusal; if Hiwassee elects not to purchase, then the sale is to be made subject to the terms of the lease.

---

[3] Hiwassee paid rents under the lease as follows:

| Year | Amount | Year | Amount |
| --- | --- | --- | --- |
| 1957 | $16,199.25 | 1977 | $31,475.61 |
| 1958 | 15,902.25 | 1978 | 34,907.40 |
| 1959 | 17,901.39 | 1979 | 37,613.40 |
| 1960 | 16,886.94 | 1980 | 42,188.43 |
| 1961 | 16,877.64 | 1981 | 48,125.39 |
| 1962 | 16,877.64 | 1982 | 52,299.54 |
| 1963 | 16,877.64 | 1983 | 52,299.54 |
| 1964 | 16,877.64 | 1984 | 52,299.54 |
| 1965 | 16,877.64 | 1985 | 55,344.37 |
| 1966 | 16,874.44 | 1986 | 55,344.37 |
| 1967 | 17,947.41 | 1987 | 55,344.37 |
| 1968 | 17,947.41 | 1988 | 55,344.37 |
| 1969 | 17,947.41 | 1989 | 55,344.37 |
| 1970 | 19,119.86 | 1990 | 59,911.63 |
| 1971 | 19,119.86 | 1991 | 59,911.63 |
| 1972 | 20,472.68 | 1992 | 59,911.63 |
| 1973 | 20,472.68 | 1993 | 59,911.63 |
| 1974 | 24,350.76 | 1994 | 63,493.79 |
| 1975 | 28,769.97 | 1995 | 62,858.88 |
| 1976 | 31,475.61 | | |

[4] The lease states that "It is understood" that approximately three-quarters of the mineral rights are held by parties other than the lessors.

The lease contains no requirement that Hiwassee reseed or reforest the leased land at the expiration of the lease.

The Shepherd Clifford Trust

On or about December 22, 1980, petitioner and his wife established the J. C. Shepherd "Clifford" Trust Agreement (the trust), an inter vivos trust with a term of 10 years. Upon creation of the trust, petitioner and his wife conveyed an undivided 25-percent interest in the leased land to the trust. On January 5, 1981, they conveyed a second 25-percent undivided interest in the leased land to the trust.[5]

John and William were equal income beneficiaries of the trust. During the term of the trust, they each received one-half of the income from one-half of the Hiwassee lease (i.e., each received 25-percent of the Hiwassee lease income).

On or about April 1, 1991, the trust terminated. The trustee reconveyed the two previously transferred 25-percent undivided interests in the leased land to petitioner and his wife.

---

[5] The deeds conveying the two 25-percent interests in the land show that the land was conveyed by petitioner and his wife. Petitioner's wife, however, owned no record title or interest in the property. Her only interests were spousal rights and benefits created under Alabama State law. The parties have stipulated that in Alabama real estate transactions, it is customary for the owner's spouse to sign all documents to eliminate questions regarding retention of dower or other spousal benefits or rights.

The Shepherd Family Partnership

On August 1, 1991, petitioner executed the Shepherd Family Partnership Agreement (the partnership agreement). On August 2, 1991, John and William executed it. The Shepherd Family Partnership (the partnership) is a general partnership established pursuant to Alabama State law. The partnership agreement designates petitioner as the managing partner, with power to "implement or cause to be implemented all decisions approved by the Partners, and shall conduct or cause to be conducted the ordinary and usual business and affairs of the Partnership". The partners' interests in the partnership's net income and loss, capital, and partnership property are as follows: Petitioner--50 percent; John--25 percent; and William--25 percent. The partnership agreement provides that these partnership interests will continue throughout the existence of the partnership unless the partners mutually agree to change their respective interests.

The partnership agreement provides that each partner shall have three capital accounts--a permanent capital account, an operating capital account, and a drawing capital account. The partnership agreement states that the initial permanent capital account for each partner, as of August 1, 1991, is $10 for petitioner and $5 each for William and John. In this same section, captioned "INITIAL CAPITAL CONTRIBUTIONS", the partnership agreement also states: "Each Partner shall be

entitled to make voluntary additional permanent capital contributions. Each such contribution shall be allocated in the Partnership Interests to the Partners' permanent capital accounts."

In a section captioned "DEBITS/CREDITS", the partnership agreement provides that the permanent capital account of each partner shall consist of each partner's initial capital contribution as described above increased by the "Partner's Partnership Interest in the adjusted basis for federal income tax purposes of any additional permanent capital contribution of property by a Partner (less any liabilities to which such property is subject)".

The partnership agreement provides that "Any Partner shall have the right to receive a distribution of any part of his Partnership permanent capital account in reduction thereof with the prior consent of all the other Partners."

The partnership agreement also provides that all property acquired by the partnership shall be owned by the partners as tenants in partnership in accordance with their partnership interests, with no partner individually having any ownership interest in the partnership property. Additionally, each partner waives any right to require partition of any partnership property.

Under the partnership agreement, any partner may withdraw from the partnership at any time, upon written notice to the

other partners. The partnership agreement states that the effect of the withdrawal is to terminate the relationship of the withdrawing partner as a partner and thereby eliminate the withdrawing partner's right to liquidate the partnership. The withdrawing partner may transfer all or any part of his partnership interest with or without consideration, but only after providing the other partners the first option to purchase his interest at fair market value, generally as determined by an independent appraiser.

Upon dissolution of the partnership, proceeds from the liquidation of partnership property, after satisfaction of partnership debts, are to be applied to payment of credit balances of the partners' capital accounts.

Transfer of the Leased Land to the Partnership

On August 1, 1991--one day before John and William had executed the partnership agreement--petitioner and his wife executed two deeds purporting to transfer the leased land to the partnership.[6] Each deed purported to transfer to the partnership an undivided 50-percent interest in the leased land (for an aggregate transfer of the entire interest in the leased land). On August 30, 1991, the deeds conveying the leased land to the partnership were recorded.

---

[6] Again, as far as is revealed in the record, petitioner's wife owned no record title or interest in the leased land but signed the deeds as a formality to eliminate any question as to spousal benefits under Alabama law.

Transfer of the Bank Stock to the Partnership

On September 9, 1991, petitioner transferred to the partnership some of his stock in each of the three banks.[7] The parties have stipulated that the bank stock had a fair market value at the time of transfer (prior to any consideration of any partnership adjustment) as follows:

| Stock | No. of Shares | Fair Market Value |
|---|---|---|
| Bank of Berry, AL | 313 shares | $186,633 |
| Bank of Carbon Hill, AL | 136 shares | 279,140 |
| Bank of Parrish, AL | 262 shares | 466,446 |
| Total | | 932,219 |

Petitioner's Gift Tax Return and Respondent's Determination

Petitioner filed Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, for calendar year 1991, reporting gifts to John and William of interests in the leased land and the bank stock. On the Form 709, petitioner valued the leased land at $400,000. Petitioner listed the total appraised value of the transferred bank stock as $932,219, less a 15-percent minority discount, for a gift value of $792,386. Petitioner reported a gift to John and William of $298,097 each (25 percent of the total reported $400,000 value of the leased land and $792,386 value of the transferred bank stock). Petitioner reported no gift tax due on these transfers, the gift

_____

[7] Petitioner testified that he did not know what percentage of his stock in the three banks he transferred to the partnership in 1991 but that after the transfers he still owned a greater than 50-percent interest in each bank.

tax computed ($187,966) being more than offset by his claimed maximum unified credit ($192,800).

In the notice of deficiency, respondent determined that the fair market value of the 50-percent interest in the leased land that petitioner gifted to his sons was $639,300 (implying a value of $1,278,600 for petitioner's entire interest in the leased land).  Respondent made no adjustment to the gift value of the bank stock reported on the return.  Respondent determined that petitioner had a gift tax deficiency of $168,577.

OPINION

A.  General Legal Principles

Section 2501 generally imposes an excise tax on the transfer of property by gift during the taxable year.  The gift tax is imposed only upon a completed and irrevocable gift.  See Burnet v. Guggenheim, 288 U.S. 280 (1933).  A gift is complete as to any property when "the donor has so parted with dominion and control as to leave in him no power to change its disposition, whether for his own benefit or for the benefit of another".  Sec. 25.2511-2(b), Gift Tax Regs.

A gift of property is valued as of the date of the transfer.  See sec. 2512(a).  If property is transferred for less than adequate and full consideration, then the excess of the value of the property transferred over the consideration received is generally deemed a gift.  See sec. 2512(b).  The gift is measured by the value of the property passing from the donor, rather than

by the property received by the donee or upon the measure of enrichment to the donee. See sec. 25.2511-2(a), Gift Tax Regs.

For gift tax purposes, the value of the transferred property is generally the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 551 (1973); see sec. 25.2512-1, Gift Tax Regs.

The determination of property value for gift tax purposes is an issue of fact, and all relevant factors must be considered. See Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding T.C. Memo. 1956-178; LeFrak v. Commissioner, T.C. Memo. 1993-526.

B. The Parties' Contentions

The parties disagree about the characterization, for gift tax purposes, of petitioner's transfers of the leased land and bank stock. The parties also disagree about the fair market value of the leased land at the time petitioner transferred it. In addition, the parties disagree as to what valuation discounts should apply to petitioner's transfer of the leased land and bank stock. The nub of the parties' disagreement in this last regard is whether petitioner's transfers to the partnership should reflect minority and marketability discounts attributable to the sons' minority-interest status in the partnership.

In his petition, petitioner not only assigns error to respondent's determination in the statutory notice but also seeks a partial restoration of his unified credit. Petitioner contends that the gifts to his sons of interests in the leased land represent two separate gifts of partnership interests and that the gifts of bank stock represent two separate indirect gifts bestowed through enhancements of the previously gifted partnership interests. Viewed thus, petitioner contends, these gifts should be valued giving effect to a 33.5-percent minority and marketability discount applicable to each son's 25-percent partnership interest. The bottom line, petitioner argues, is that the gifts of both the leased land and the bank stock, as reported on his 1991 gift tax return, were overvalued.

Respondent does not dispute that the partnership exists or that it is a legitimate partnership.[8] Respondent also agrees that if the gifts of land were to be valued giving effect to minority and marketability discounts in recognition of the 25-percent partnership shares, then the appropriate discount would be 33.5 percent. Respondent contends, however, that this discount rate is inapplicable, because the gifts should not be measured by reference to the sons' partnership interests. In

_____

[8] Moreover, respondent has not argued and we do not consider the applicability of chapter 14 (secs. 2701-2704), relating to special valuation rules that apply to, among other things, transfers of certain interests in partnerships and certain lapsing rights and restrictions.

support of his position, respondent contends that petitioner did not give his sons partnership interests but rather gave them either:  (1) Indirect gifts of real estate, accomplished by means of a transfer to the partnership, or alternatively (2) direct gifts of real estate, accomplished before the partnership ever came into existence.

C.  Characterization of the Transfers

The parties agree that the partnership came into existence on August 2, 1991, when John and William executed the partnership agreement, rather than on the previous day, when only petitioner had executed it.  The parties disagree, however, about the effect of petitioner's executing deeds on August 1, 1991, purporting to transfer the leased land to the then-nonexistent partnership. Respondent argues that on August 1, 1991, petitioner effectively gave an undivided 50-percent interest in the leased land to his sons, either directly or indirectly.  Petitioner argues that the gift was not completed until August 2, 1991.  We look to applicable State law, in this case Alabama law, to determine what property rights are conveyed.  See United States v. National Bank of Commerce, 472 U.S. 719, 722 (1985) ("'in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property'" (quoting Aquilino v. United States, 363 U.S. 509, 513 (1960)); LeFrak v. Commissioner, supra.

We agree with petitioner that any gift to his sons was not completed before August 2, 1991.[9]  On August 1, 1991, there was no completed gift, because there was no donee, and petitioner had not parted with dominion and control over the property. Petitioner could not make a gift to himself.  See Kincaid v. United States, 682 F.2d 1220, 1224 (5th Cir. 1982).

We disagree with petitioner's contention, however, that his gifts to his sons of interests in the leased land represented gifts of minority partnership interests because, as just discussed, the creation of the partnership (and therefore the creation of the sons' partnership interests) preceded the completion of petitioner's gift to the partnership.  To adopt petitioner's contention would require us to recognize the existence, however fleeting, of a one-person partnership, contrary to Alabama law, which defines a partnership as "An association of two or more persons to carry on as co-owners a

_____

[9] The Alabama Recording Act, Ala. Code sec. 35-4-90(a) (1991), generally provides that the conveyance of land is void as to the grantee unless the deed transferring the land is recorded. Here, the deeds conveying the land to the partnership were not recorded until Aug. 30, 1991.  Neither party has raised, and we do not reach, the issue of whether petitioner's gifts were not completed until the date of recordation.  Cf. Estate of Whitt v. Commissioner, 751 F.2d 1548, 1561 (11th Cir. 1985) (facts indicated that gifts were not intended to be completed until the recordation of the deeds of conveyance), affg. T.C. Memo. 1983-262.  It is of little consequence to our analysis, however, whether petitioner's gifts of interests in the leased land were completed on Aug. 2 or Aug. 30, 1991.

business for profit." Ala. Code sec. 10-8-2 (1994); see <u>LeFrak</u>
<u>v. Commissioner</u>, <u>supra</u>.

Nor do we agree with petitioner's contention that his
transfers should be characterized as enhancements of his sons'
existent partnership interests. The gift tax is imposed on the
transfer of property. See sec. 2501. Here the property that
petitioner possessed and transferred was his interests in the
leased land and bank stock. How petitioner's transfers of the
leased land and bank stock may have enhanced the sons'
partnership interests is immaterial, for the gift tax is imposed
on the value of what the donor transfers, not what the donee
receives. See <u>Robinette v. Helvering</u>, 318 U.S. 184, 186 (1943)
(the gift tax is "measured by the value of the property passing
from the donor"); <u>Stinson Estate v. United States</u>, 214 F.3d 846,
849 (7th Cir. 2000); <u>Citizens Bank & Trust Co. v. Commissioner</u>,
839 F.2d 1249 (7th Cir. 1988) (for gift and estate tax purposes,
value of stock transferred to trusts was determined without
regard to terms or existence of trust); <u>Goodman v. Commissioner</u>,
156 F.2d 218, 219 (2d Cir. 1946), affg. 4 T.C. 191 (1944); <u>Ward</u>
<u>v. Commissioner</u>, 87 T.C. 78, 100-101 (1986); <u>LeFrak v.</u>
<u>Commissioner</u>, <u>supra</u>; sec. 25.2511-2(a), Gift Tax Regs.; cf.
<u>Estate of Bright v. United States</u>, 658 F.2d 999, 1001 (5th Cir.
1981) (for estate tax purposes, "the property to be valued is the
property which is actually transferred, as contrasted with the

interest held by the decedent before death or the interest held by the legatee after death").

1.  Petitioner's Constitutional Challenge

Petitioner argues that the gift tax must be measured not by reference to the value of the property in the hands of the donor but "by the value of the property in gratuitous transit." Otherwise, petitioner argues, the gift tax would be a direct tax on the transferred property, in contravention of the constitutional restraint on the imposition of direct taxes (the Direct Tax Clause).  See U.S. Const. art. I, sec. 9, cl. 4 ("No capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.").

Petitioner's argument is without merit.  In upholding the Federal gift tax against a challenge based on the Direct Tax Clause, the Supreme Court stated in Bromley v. McCaughn, 280 U.S. 124, 136-138 (1929):

> While taxes levied upon or collected from persons because of their general ownership of property may be taken to be direct, * * * this Court has consistently held, almost from the foundation of the government, that a tax imposed upon a particular use of property or the exercise of a single power over property incidental to ownership, is an excise which need not be apportioned, and it is enough for present purposes that this tax is of the latter class * * *
>
> &ast;      &ast;      &ast;      &ast;      &ast;      &ast;      &ast;
>
> It is said that since property is the sum of all the rights and powers incident to ownership, if an unapportioned tax on the exercise of any of them is

upheld, the distinction between direct and other classes of taxes may be wiped out, since the property itself may likewise be taxed by resort to the expedient of levying numerous taxes upon its uses; that one of the uses of property is to keep it, and that a tax upon the possession or keeping of property is no different from a tax on the property itself. Even if we assume that a tax levied upon all the uses to which property may be put * * * would be in effect a tax upon property, * * * and hence a direct tax requiring apportionment, that is not the case before us.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

* * * [The gift tax] falls so far short of taxing generally the uses of property that it cannot be likened to the taxes on property itself which have been recognized as direct.  It falls, rather, into that category of imposts or excises which, since they apply only to a limited exercise of property rights, have been deemed to be indirect and so valid although not apportioned.

In short, the gift tax is not a direct tax because it is not levied on the "general ownership" of property but rather applies only to "a limited exercise of property rights"; i.e., the exercise of the "power to give the property owned to another." Id. at 136.  Here, petitioner's dispute is not with the fact that he made a donative transfer that is properly the subject of the Federal gift tax, but rather with the characterization of the property for purposes of measuring its value--a consideration that is irrelevant for purposes of determining the constitutionality of the tax.[10]

---

[10] Indeed, in a closely analogous context, the Supreme Court has held that the constitutionality of the Federal estate tax does not depend upon there even being a transfer of the property at death.  See Fernandez v. Wiener, 326 U.S. 340, 355 (1945);
(continued...)

2.  <u>Did Petitioner Make Direct Gifts to His Sons?</u>

Petitioner deeded the leased land and bank stock to the partnership.  Whatever interests his sons acquired in this property they obtained by virtue of their status as partners in the partnership.  Clearly, then, contrary to one of respondent's alternative arguments, petitioner did not make direct gifts of these properties to his sons.  Cf. <u>LeFrak v. Commissioner</u>, <u>supra</u> (transfer by donor-father of buildings to himself and his children as tenants in common, "d.b.a." (doing business as) one of various partnerships formed later the same day to hold the particular building conveyed, represented direct gifts to the children of the father's interest in the buildings).

3.  <u>Did Petitioner Make Indirect Gifts to His Sons?</u>

A gift may be direct or indirect.  See sec. 25.2511-1(a), Gift Tax Regs.  The regulations provide the following example of a transfer that results in an indirect taxable gift, assuming that the transfer is not made for adequate and full consideration:  "A transfer of property by B to a corporation generally represents gifts by B to the other individual shareholders of the corporation to the extent of their

---

[10](...continued)
Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 120.1.3, at 120-6 (2d ed. 1993) (the transfer of property at death is "a sufficient condition--but <u>not</u> a necessary one--for a constitutional tax.  By holding that a tax on a transfer at death is not a direct tax, the Court did not imply that a tax on something other than a transfer at death is a direct tax").

proportionate interests in the corporation." Sec. 25.2511-1(h)(1), Gift Tax Regs.

Application of this general rule is well established in case law. For instance, in Kincaid v. United States, 682 F.2d at 1225, the taxpayer transferred her ranch to a newly formed corporation in which she and her two sons owned all the voting stock. In exchange for the ranch, the taxpayer received additional shares of the corporation's stock. The stock was determined to be less valuable than the ranch. The court concluded that the difference between what she gave and what she got represented a gift to the shareholders. Noting that the taxpayer could not make a gift to herself, the court held that she made a gift to each of her sons of one-third of the total gift amount. See also Heringer v. Commissioner, 235 F.2d 149, 151 (9th Cir. 1956) (transfers of farm lands to a family corporation of which donors were 40-percent owners represented gifts to other shareholders of 60 percent of the fair market value of the farm lands), modifying and remanding 21 T.C. 607 (1954); CTUW Georgia Ketteman Hollingsworth v. Commissioner, 86 T.C. 91 (1986) (mother's transfer to closely held corporation of property in exchange for note of lesser value represented gifts to the other five shareholders of five-sixths the difference in values of the property transferred and the note the mother received); Estate of Hitchon v. Commissioner, 45 T.C. 96 (1965) (father's transfer of stock to a family corporation for no

consideration constituted gift by father of one-quarter interest to each of three shareholder-sons); Estate of Bosca v. Commissioner, T.C. Memo. 1998-251 (father's transfer to a family corporation of voting common stock in exchange for nonvoting common stock represented gifts to each of his two shareholder-sons of 50 percent of the difference in the values of the stock the father transferred and of the stock he received); cf. Chanin v. United States, 183 Ct. Cl. 745, 393 F.2d 972 (1968) (two brothers' transfers of stock in their wholly owned corporation to the subsidiary of another family corporation constituted gifts to the other shareholders of the family corporation, reduced by the portion attributable to the brothers' own ownership interests in the family corporation).

Likewise, a transfer to a partnership for less than full and adequate consideration may represent an indirect gift to the other partners. See Gross v. Commissioner, 7 T.C. 837 (1946) (taxpayer's and spouse's transfer of business assets into a newly formed partnership among themselves, their daughter, and son-in-law resulted in taxable gifts to the daughter and son-in-law). Obviously, not every capital contribution to a partnership results in a gift to the other partners, particularly where the contributing partner's capital account is increased by the amount of his contribution, thus entitling him to recoup the same amount upon liquidation of the partnership. In the instant case, however, petitioner's contributions of the leased land and bank

stock were allocated to his and his sons' capital accounts according to their respective partnership shares. Under the partnership agreement, each son was entitled to receive distribution of any part of his capital account with prior consent of the other partners (i.e., his father and brother), and was entitled to sell his partnership interest after granting his father and brother the first option to purchase his interest at fair market value. Upon dissolution of the partnership, each son was entitled to receive payment of the balance in his capital account.

In these circumstances, we conclude and hold that petitioner's transfers to the partnership represent indirect gifts to each of his sons, John and William, of undivided 25-percent interests in the leased land and in the bank stock.[11] In reaching this conclusion, we have effectively aggregated petitioner's two separate, same-day transfers to the partnership of undivided 50-percent interests in the leased land to reflect

---

[11] We do not suggest, and respondent has not argued, that such an analysis necessarily entails disregarding the partnership. Similarly, in Kincaid v. United States, 682 F.2d 1220 (5th Cir. 1982), and in the other cases cited supra treating gifts to corporations as indirect gifts to the other shareholders, the courts did not necessarily disregard the donee corporations. In either case, characterizing the subject gift as comprising proportional indirect gifts to the other partners or shareholders, as the case may be, rather than as a single gift to the entity of which the donor is part owner, reflects the exigency that the donor cannot make a gift to himself or herself. See id. at 1224 ("Mrs. Kincaid cannot, of course, make a gift to herself").

the economic substance of petitioner's conveyance to the partnership of his entire interest in the leased land.  We have not, however, aggregated the separate, indirect gifts to his sons, John and William.  See Estate of Bosca v. Commissioner, T.C. Memo. 1998-251 (for purposes of the gift tax, each separate gift must be valued separately), and cases cited therein; cf. Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981) (rejecting family attribution in valuing stock for estate tax purposes).

D.  Valuation of the Leased Land

The parties rely on expert testimony to value petitioner's interest in the leased land at the time he transferred it to the partnership.  We evaluate expert opinions in light of all the evidence in the record and may accept or reject the expert testimony, in whole or in part, according to our own judgment. See Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Mellinger v. Commissioner, 112 T.C. 26, 39 (1999). "The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based."  Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998).  We may be selective in our use of any part of an expert's opinion.  See id.

Petitioner presented testimony of three expert witnesses: Mr. Norman W. Lipscomb (Lipscomb), Mr. Gene Dilmore (Dilmore), and Mr. Harry L. Haney, Jr. (Haney).

Lipscomb valued petitioner's 100-percent interest in the leased land under both a sales comparison approach[12] and an income capitalization approach,[13] and then reconciled the two results. Under his sales comparison approach, Lipscomb valued the leased land at $958,473. In arriving at this value, Lipscomb determined an indicated value of the leased land on the basis of each of four comparable sales, then discounted each indicated value by 45 percent on the theory that buyers would demand a significant discount for property encumbered by a lease for 32 years. Under his income capitalization approach, Lipscomb valued the leased land at $795,364. Treating the values determined under the sales comparison approach and the income capitalization approach as establishing upper and lower boundaries, respectively, of a range of possible values, and weighing the income capitalization approach most heavily, Lipscomb determined that the value of a 100-percent interest in the leased land, as of the date of the gifts, was $850,000. Lipscomb then determined that a 50-percent undivided interest should be subject to a 27-percent discount for a fractional ownership interest, as determined by a range of adjustments suggested by his analysis of

---

[12] Under a sales comparison approach, property is valued by identifying sales of comparable properties and making appropriate adjustments to the sales prices.

[13] Under an income capitalization approach, income-producing property is valued by estimating the present value of anticipated future economic benefits; i.e., cash flows and reversions.

what he deemed to be three comparable sales of fractional real estate interests. The net result was that Lipscomb valued a 50-percent undivided interest in the leased land as of March 31, 1991, at $310,250.

Dilmore used an income capitalization approach to arrive at a $210,000 value for an undivided one-half fee interest in the leased land as of March 31, 1991, after applying a 15-percent discount for an undivided interest in the property.

Haney's report is limited to identifying various factors that could negatively affect the value of the reversionary interest in the leased land at the expiration of the long-term timber lease on January 1, 2023 (the reversion); he provided no specific dollar estimate of the reversion's value.

Respondent's expert, Mr. Richard A. Maloy (Maloy), also used an income capitalization approach, valuing petitioner's entire fee interest in the leased land, as of March 31, 1991, at $1,547,000, calculated as the present value of the income stream (contract rents) plus the present value of the reversion. Maloy's determination of present value reflects no discounts for fractional interests or limited marketability.

On brief, petitioner argues that the proper and most realistic way to value land subject to a long-term timber lease is to use an income capitalization methodology such as was employed in Saunders v. United States, 48 AFTR 2d 81-6279, 81-2 USTC par. 13,419 (M.D. Ga. 1981). Accordingly, the parties are

in substantial agreement that the leased land should be valued as of the time the subject gift was made as the sum of: (a) The present value of the projected annual rental income from the lease, plus (b) the present value of the reversion. The parties disagree, however, about numerous assumptions made by the experts at each step of the valuation methodology. We address these disagreements below.

1. Present Value of Projected Lease Rents

The value of the lease income stream may be estimated by determining the rental payments petitioner was receiving at the time of the gifts, then projecting those rents into the future based upon an anticipated growth rate, and finally discounting the future rents payments to a 1991 present value using an appropriate discount rate. See Saunders v. United States, supra; see also Estate of Barge v. Commissioner, T.C. Memo. 1997-188 (using an income capitalization approach to value gift of 25-percent undivided interest in timberland); cf. Estate of Proctor v. Commissioner, T.C. Memo. 1994-208. We estimate the present value of the projected income stream from the lease based upon events, expectations, and market conditions as they existed at the time of the gifts in August 1991.

a. Projected Annual Income From the Lease

It is undisputed that when petitioner made the gifts, the remaining term of the lease was approximately 32 years. The parties have also stipulated the actual rental amounts received

by petitioner from 1957 through 1995.  The parties disagree, however, about the anticipated growth rate of the annual rent payments over the remaining life of the lease.

Under the lease, rents are adjusted to reflect changes relative to the average 1955 Wholesale Price Index but only after there has been a cumulative adjustment of at least 5 percent from the last change.  In projecting future rents, Maloy, Lipscomb, and Dilmore each rely on historical changes in the PPI.  Maloy and Lipscomb agree that historical changes in the PPI averaged 1.87 percent for the 10 years before 1991.[14]  Maloy ends his analysis there, projecting rental increases of 5.6 percent (1.87 times 3) every 3 years for the duration of the lease.

Lipscomb and Dilmore also take into account historical data showing that the rate of actual rent increases has lagged behind the rate of changes in the PPI, ostensibly as a result of inconstant annual rates of increase in the PPI in combination with the requirement that rents adjust only after there has been a 5-percent cumulative change in the average price index.  On the basis of this analysis, Lipscomb projects lease rent increases of 5.2 percent every 3 years, and Dilmore estimates an average long-term growth rate of approximately 1.5 percent per year.

---

[14] Mr. Gene Dilmore (Dilmore) determined that increases in the Producer Price Index (PPI) averaged 1.41 percent over the 10 years prior to petitioner's gifts.

Because rent increases under the lease historically have lagged behind increases in the PPI, and in light of the uncertainty about the magnitude and direction of changes in PPI annual averages over a period as long as the 32 years remaining on the lease term at the time of petitioner's gifts, we conclude that it is appropriate to take into account historical patterns of actual rents under the lease. On the basis of our review of all the expert reports and testimony, we conclude that Lipscomb's projection of a 5.2-percent rent increase every 3 years for the duration of the lease is fair and reasonable.

b. Present Value of Projected Rental Payments

In determining the 1991 present value of the projected rental payments, a critical factor is the discount rate applied to the projected lease income stream.

Lipscomb selected a discount rate of 8 percent, as representing "what a typical investor would have expected for investments of this type of land." His report indicates that although the investment was "low-risk", a higher discount rate was warranted owing to the limited marketability of the investment. Lipscomb applied the 8-percent discount rate to the after-tax lease income stream (assuming a 35-percent tax rate).

Dilmore selected a discount rate of 13.5 percent, consisting of a 12.5-percent "basic discount rate" and an additional 1 percent to reflect the lack of a reforestation clause in the lease. Dilmore's report states that he selected the 12.5-percent

basic rate as being 3.5 percent over the prime lending rate of 9 percent and approximately 1.5 times the 30-year bond rate. His report indicates that this basic discount rate is consistent with the somewhat lower yields on a land lease at a Birmingham shopping center and with a national survey of 1991 real estate yields for all real estate types. His report states that a higher discount is appropriate for the leased land than for these other real estate comparables because the lease income "is dependent upon the stability or lack thereof in the timber business." His report indicates that an additional 1-percent discount should be added to his 12.5-percent basic rate to reflect the absence of any lease term requiring the lessee to reseed or reforest the land upon termination of the lease. Dilmore applied the 13.5-percent discount rate to the pretax lease income stream.

Maloy selected a discount rate of 8 percent on the basis of interviews with Federal Land Bank appraisers and forestry economics professors. Unlike Lipscomb, but like Dilmore, Maloy applied his selected discount rate to the pretax lease income stream.

i. Pretax Versus After-Tax Present Value Analysis

Respondent argues that Lipscomb's use of an after-tax analysis is inappropriate for determining fair market value. Respondent argues that an after-tax analysis is "used only to

determine the internal rate of return of a particular investor."
Respondent cites Estate of Proctor v. Commissioner, T.C. Memo.
1994-208, for the proposition that "investment" analysis does not
equate to fair market value analysis.

In Estate of Proctor, we held that in determining the fair
market value of a ranch subject to a lifetime lease option, a
"conventional lease analysis method" was preferable to an
"investment differential method",[15] because the latter method
"attempts to measure 'investment value' rather than market value.
Investment value is more subjective because it is predicated on
the investment preferences of the individual investor."  Id.  We
did not hold, however, as a matter of law that income
capitalization under the conventional lease analysis method must
be done on a pretax basis, or that particular factors that are
relevant for investment purposes are irrelevant in determining
fair market value.  Rather, we determined the applicable discount
rate based on our conclusion that it was "a better reflection of
risks associated with investing in ranch property, and is a more
accurate estimate of the rate of return investors expect to earn
when investing in ranch property."  Id.

---

[15] We defined the "investment differential method" as a
"method of valuation frequently used by appraisers to compare one
potential investment to the whole spectrum of other investment
opportunities available to a client."  Estate of Proctor v.
Commissioner, T.C. Memo. 1994-208.

There is no fixed formula for applying the factors that are considered in determining fair market value of an asset.  See Estate of Davis v. Commissioner, 110 T.C. at 536 (in determining the fair market value of minority blocks of stock in a corporation, it was appropriate to take into consideration built-in capital gains tax on the stock).  The weight given to each factor depends upon the facts of each case.  See id. at 536-537.  Here, the relevant inquiry is whether a hypothetical willing seller and a hypothetical willing buyer, as of the date of petitioner's gifts, would have agreed to a price for the lease income stream that took no account of tax consequences.  See id. at 550-554; see also Eisenberg v. Commissioner, 155 F.3d 50 (2d Cir. 1998); Estate of Borgatello v. Commissioner, T.C. Memo. 2000-264; Estate of Jameson v. Commissioner, T.C. Memo. 1999-43.

A treatise relied upon by both parties states:

Present value can be calculated with or without considering the impact of * * * income taxes as long as the specific rights being appraised are clearly identified.  The techniques and procedures selected are determined by the purpose of the analysis, the availability of data, and the market practices. [Appraisal Institute, The Appraisal of Real Estate 462 (11th ed. 1996).[16]]

---

[16] In his rebuttal report, Maloy cites the above-cited treatise for the different proposition that present value analysis is properly applied using before-tax income streams. Maloy has provided no page reference for his interpretation of the treatise, and we conclude that his reliance on the treatise is in error.

Lipscomb testified convincingly that in his experience it was customary practice in the timber industry to apply an after-tax analysis.[17]  In his rebuttal report, Maloy includes as an appendix portions of a treatise (Bullard, Basic Concepts in Forest Valuation and Investment Analysis, sec. 6.2 (1998)) that describe the use of an after-tax analysis for forestry investments, whereby one converts all costs and revenues to an after-tax basis and calculates all present values using an after-tax discount rate.  Accordingly, authorities relied upon by respondent's own expert appear to acknowledge that an after-tax analysis, consistently utilizing after-tax income and after-tax discount rates, may be appropriate.[18]

It is true, as Maloy indicates in his rebuttal report, that an after-tax analysis requires an assumption as to whether the hypothetical buyer is taxable and at what rate.  It appears, however, that in selecting his discount rate, Maloy himself has

---

[17] Dilmore testified that in this case he had used a before-tax analysis to determine the present value of the lease income stream, but "you could do it either way."

[18] In his rebuttal report filed before trial, Maloy contends that Lipscomb inconsistently used an 8-percent pretax discount rate against after-tax income.  Although Lipscomb's expert report is not explicit in this regard, it is clear from Lipscomb's testimony that his income capitalization method was an after-tax method, entailing use of an after-tax discount rate.

assumed that the hypothetical buyer is taxable at rates consistent with those used in Lipscomb's after-tax analysis.[19]

Accordingly, we reject respondent's suggestion that in determining the present value of a projected income stream for gift tax purposes, the determination must as a matter of law be made on a pretax basis.

Given Lipscomb's assumed 35-percent tax rate, his 8-percent after-tax discount rate may be converted to a pretax discount rate of approximately 12.3 percent (8 divided by (1.0-.35)), which is very close to the 12.5-percent pretax "basic rate" selected by Dilmore for use in his pretax analysis. In the instant circumstances, the critical question, we believe, is not whether to use a pretax or after-tax analysis, but whether it is more appropriate to apply the pretax discount rate selected by Maloy (8 percent), or by Dilmore (13.5 percent), or the equivalent pretax discount rate selected by Lipscomb (12.3 percent).

---

[19] Maloy's report indicates that, on the basis of his research, yield rates associated with investments like the subject lease range from 6 to 8 percent, with the lower yields more likely associated with investors who are tax-exempt. Maloy selects an 8-percent rate associated with taxable investors. Moreover, an 8-percent rate is approximately 33 percent higher than the 6-percent rate that he associates with tax-exempt investors, implying a 33-percent tax rate, which coincides roughly with the 35-percent tax rate that Lipscomb assumes in his analysis.

ii.  Nominal Versus Real Discount Rates

The lease terms adjust the annual rent payments for inflation.  The parties disagree over whether, in light of this inflation-adjustment feature, it is appropriate to use a "real" discount rate (i.e., a discount rate that eliminates the effects of inflation) or a higher "nominal" discount rate (i.e., the real rate plus the inflation rate).  Maloy's expert report states that the appropriate discount rate to apply here is a real rate.  On brief, respondent argues that the discount rates used by petitioner's experts are too high because they are nominal rates.  Petitioner and his experts counter that in the instant circumstances only nominal discount rates and not real rates are appropriate.

The differences between the parties appear rooted at least partly in semantics.  Acknowledging that these matters are not self-evident to those unbaptized in the murky waters of actuarial science, we agree with petitioner and his experts, whose views align with the aforementioned learned treatise, Appraisal Institute, supra at 460-461, relied upon for different purposes by both parties, which states as follows:

> Because lease terms often allow for inflation with * * * adjustments based on the Consumer Price Index (CPI), it is convenient and customary to project income and expenses in dollars as they are expected to occur, and not to convert the amounts into constant dollars. Unadjusted discount rates, rather than real rates of return, are used so that these rates can be compared with other rates quoted in the open market--e.g., mortgage interest rates and bond yield rates. * * *

\* \* \* \* \* \* \*

      Projecting the income from real estate in nominal terms allows an analyst to consider whether or not the income potential of the property and the resale price will increase with inflation.  The appraiser must be consistent and not discount inflated dollars at real, uninflated rates.  <u>When inflated nominal dollars are projected, the discount rate must also be a nominal discount rate that reflects the anticipated inflation</u>.  [Emphasis added.]

We conclude that Maloy's 8-percent discount rate is understated as a result of his inappropriate use of a real discount rate rather than a higher nominal discount rate.

> ### iii.  <u>Adjustment of Discount Rate for Lack of Marketability</u>

It also appears that the differences between respondent's and petitioner's experts are partly attributable to the fact that they are valuing different things.  Maloy's report states that he has determined the market value of petitioner's leased fee interest.  Dilmore and Lipscomb, on the other hand, have each valued an undivided one-half interest in the leased fee interest. Lipscomb, like Maloy but unlike Dilmore, acknowledges that the leased land is a "low-risk" investment, which would suggest a relatively low discount rate.  Lipscomb's recommended discount rate reflects an upward adjustment to reflect the limited marketability of an undivided one-half interest.

As previously discussed, we have determined that petitioner's transfer of the leased land to the partnership should be characterized as two separate undivided 25-percent

interests in the leased land.  We agree with Lipscomb that an undivided fractional interest in the leased land will make it a less favorable investment than the entire interest, by making it less marketable and more illiquid, and that these factors may be appropriately considered in selecting the discount rate.[20]  See Saunders v. United States, 48 AFTR 2d 81-6279, 81-2 USTC par. 13,419 (M.D. Ga. 1981).  Accordingly, we conclude that Lipscomb's selected discount rate is fair and reasonable.  Our conclusion is bolstered by the fact that, when converted to a pretax rate, Lipscomb's discount rate nearly coincides with the "basic rate" determined by Dilmore using a different methodology based on comparisons with various other types of investments.[21]

---

[20] Alternatively, where the value of the transferred property is to be determined with adjustments for lack of marketability, it could be appropriate in some circumstances to value the donor's entire interest in the transferred property employing a discount rate that reflects no adjustment for lack of marketability, and then to adjust the value so determined for lack of marketability with appropriate valuation discounts.  As discussed infra, however, it is inappropriate to make redundant adjustments to both the discount rate and the valuation discount.  See Bittker & Lokken, Federal Taxation of Income, Estates, and Gifts, par. 135.3.2, at 135-30 (2d ed. 1993) ("When property is valued by capitalizing its anticipated net earnings, no marketability discount is needed if the capitalization factor reflects not only the earnings in isolation, but also the fact that the investor may find it difficult to liquidate the investment.").

[21] We reject Dilmore's additional 1-percent discount for the lack of a reforestation clause at the end of the lease.  As discussed infra, respondent has allowed, and we have accepted, an allowance for reforestation in determining the value of the reversion, thus making Dilmore's additional 1-percent discount for this purpose unnecessary.

We hold and conclude, therefore, that Lipscomb has fairly and reasonably determined the net present value of the lease income stream to be $566,773.

2. Present Value of the Reversion

Lipscomb's income capitalization approach assumes that the leased land will have a January 1, 2023, pretax reversion value of $4,127,687. Lipscomb then purports to arrive at a January 1, 2023, after-tax value of the reversion by assuming a 35-percent tax on $4,127,687, and then discounting this after-tax amount to 1991 present value using an 8-percent discount rate. Nothing in the record explains Lipscomb's derivation of his estimated January 1, 2023, pretax conversion value.[22] Furthermore, we

---

[22] On brief, petitioner alleges that to arrive at the $4,127,687 value for the reversion of the leased land, Lipscomb applied a growth rate of 4 percent to comparable 1991 values. The parts of the record that petitioner's brief cites in support of this proposition, however, do not yield this information, nor have we discovered it elsewhere in the record. Statements in briefs do not constitute evidence. See Rule 143(b). Even if we were to assume arguendo that petitioner's representation about Lipscomb's derivation of the reversion value were accurate, the record is inadequate to allow us to identify with certainty the comparables Lipscomb used for this purpose or to meaningfully evaluate the appropriateness of either the comparables or the assumed growth rate that petitioner alleges Lipscomb employed in his analysis.

If we were to assume arguendo that the comparables in question were the same comparables Lipscomb used in his sales comparison approach, the facts disclosed in his report and testimony are inadequate to persuade us that those comparables were determined appropriately. As previously discussed, using the sales comparison approach, Lipscomb determined that petitioner's interest in the leased land had a 1991 fair market value of $958,473. Lipscomb derived this number by applying a 45-percent marketability discount to what he deemed to be comparable sales. Lipscomb testified that he determined the 45-
(continued...)

disagree with Lipscomb's implicit premise, otherwise unsupported by the record or common sense, that in determining the fair market value of the reversion--either in 2023 or in 1991--a hypothetical willing buyer and seller would have adjusted the price downward to account for the seller's income tax liability on the sale.  Cf. <u>Estate of Davis v. Commissioner</u>, 110 T.C. 530 (1998).

Dilmore calculates the January 1, 2023, value of the reversion by projecting lease rental income to be $95,052 in 2023, and then capitalizing it at a rate of 12.6 percent, to yield an estimated January 1, 2023, value of $754,381.  He then discounts the January 1, 2023, value to 1991 present value. Dilmore's method improperly seeks to determine the January 1, 2023, value of the reversion on the basis of the final year's lease payments.  We are unconvinced that the fair market value of the land in 2023, when the lease expires, is properly computed on the basis of the last year's rent payments under the lease. Accordingly, we reject Dilmore's conclusions in this regard.

Respondent's expert Maloy calculates the value of the reversion by first establishing a $238 per acre "baseline"

---

[22](...continued)
percent discount based on analysis of sales of other leased properties, which showed a range of discounts from 30 percent to "almost 100 percent".  The record does not reveal how Lipscomb chose the 45-percent discount from this wide range.  Moreover, the data underlying his analysis of these other sales are not part of the record.  Accordingly, we are unable to assess or accept the appropriateness of the 45-percent discount that Lipscomb applied.

estimate of the value of a 100-percent fee simple interest in the leased land in 1991.  Maloy determines this baseline estimate on the basis of comparisons with numerous property sales in the same counties as the leased land.  Maloy then applies a growth rate of 5 percent to project a future value for the reversion in 2023 of $10,245,020.[23]  From this amount, Maloy subtracts $2,454,315 for estimated replanting costs in 2023, to yield net future value in 2023 of $7,790,706.[24]  Maloy then applies a discount rate of 8 percent to yield a present value of the reversion of $663,768.

As previously discussed, we disagree with Maloy's selected discount rate as being understated.  We conclude, however, that Maloy's valuation of the reversion is in all other respects reasonable and is based on sound assumptions and methodology, taking into consideration, among other things, reasonable costs of reforesting the land at the end of the lease.[25]  Accordingly,

---

[23] Maloy's assumption of a 5-percent growth rate is based on his determination that timberland in general would benefit from increased timber prices, Federal programs, and the leasing of hunting rights.

[24] Maloy estimates replanting costs in 2023 by determining an estimated $150 per acre replanting cost in 1990 and then adjusting this number upward to reflect an estimated annual inflation rate of 1.87 percent.

[25] Petitioner's own witness, Charles Irwin, testified that in 1991 it probably would have cost $75-$80 per acre to prepare the land for planting if it lay fallow for under 1 year, and $50-$55 per acre to plant the land, resulting in a total cost of $125-$135 per acre.  Thus, Maloy's replanting estimate is actually greater than Irwin's.  Irwin does claim that the costs to prepare the land could "probably double" if the fallow period was 4 or 5 years.  It seems unlikely, however, that the lessee

(continued...)

employing Maloy's methodology but substituting the pretax equivalent of Lipscomb's selected discount rate (12.3 percent), we hold that at the time of petitioner's gifts, the present value of the reversion in the leased land was $190,291.[26]

E.  Discounts for Fractional Interests

The parties have stipulated that if we were to measure petitioner's gifts by reference to the sons' interests in the partnership, the correct minority and marketability discount would be 33.5 percent.  We have determined, however, that petitioner's transfers represented separate, indirect gifts to his sons of interests in the leased land and bank stock, rather than gifts of partnership interests or enhancements thereto.  As previously discussed, the gift tax is imposed on the value of what the donor transfers, not what the donee receives.  See Robinette v. Helvering, 318 U.S. at 186 (the gift tax is "measured by the value of the property passing from the donor");

---

[25](...continued)
under a long-term timber lease would allow the land to lie fallow for a number of years before the end of the lease, rather than managing timber harvesting to maximize the timber's growth potential for the full duration of the lease.

[26] On brief, petitioner--agreeing wholly with none of his several experts, but instead relying selectively on discrete aspects of their several reports--urges that the 1991 value of the reversion was only $30,024.  In defense of this small number, petitioner argues that "no one in their right mind is going to pay anything in 1991 for a residual interest in the year 2023".  Petitioner argues, among other things, that there may be a reduced market for timber, because we may have a paperless society by 2023.  Maybe sooner, judging by the size of the record in this case.  Nevertheless, we are unpersuaded that a future fee interest in more than 9,000 acres of Alabama timberland has little or no value.

Stinson Estate v. United States, 214 F.3d at 849; Citizens Bank & Trust Co. v. Commissioner, 839 F.2d 1249 (7th Cir. 1988) (for gift and estate tax purposes, value of stock transferred to trusts was determined without regard to terms or existence of trust); Goodman v. Commissioner, 156 F.2d at 219; Ward v. Commissioner, 87 T.C. at 100-101; LeFrak v. Commissioner, T.C. Memo. 1993-526; sec. 25.2511-2(a), Gift Tax Regs. Accordingly, the subject gifts are not measured by reference to the sons' partnership interests. Because the conditions of the stipulation are not met, we must consider what valuation discounts, if any, are applicable.

1. The Leased Land

Lipscomb opined that a 27-percent discount was appropriate in recognition of the fractionalized ownership of the leased land because of the resulting reduction in marketability and control.[27] As previously discussed, however, in performing his analysis of the 1991 present value of the lease income, Lipscomb had previously taken lack of marketability into account in adjusting his discount rate upward. Consequently, his 27-percent valuation discount is redundant insofar as it reflects lack of marketability and to that extent is excessive. Lipscomb's analysis is insufficiently detailed to permit us to isolate the

---

[27] Lipscomb determined the 27-percent discount rate by analyzing sales of what he deemed to be similar properties, which indicated a range of adjustments from 25 percent to 100 percent.

redundant elements.  Accordingly, we reject his recommended 27-percent valuation discount.

Dilmore testified that an undivided interest in the leased land should be subject to a discount of 15 percent, comprising these three elements:

(1) Operation--a 3-percent discount for lack of complete control of the management of the property and of decisions made about it;

(2) Disposition of the property--a 10-percent discount to reflect the possibility of disagreement between the co-owners and the necessity of getting them to agree on the sale; and

(3) Partitioning--a 2-percent discount in recognition of the eventuality that partitioning of the physical property might become necessary.  Dilmore indicated that "This would appear to be a fairly minor factor" for the leased land.

On brief, respondent argues that no valuation discount for fractional interests is warranted with respect to the leased land, but, if it were, it should be measured solely by the cost of partitioning the land, which Maloy opined would probably be about $25,000.  We reject respondent's argument as failing to give adequate weight to other reasons for discounting a fractional interest in the leased land, such as lack of control in managing and disposing of the property.  See Estate of Stevens v. Commissioner, T.C. Memo. 2000-53; Estate of Williams v. Commissioner, T.C. Memo. 1998-59.

Accordingly, on the basis of our review of all the expert testimony and reports, we conclude and hold that Dilmore's 15-percent valuation discount for an undivided fractional interest in the leased land is fair and reasonable.[28]

2.  The Bank Stock

With regard to the bank stock, respondent has not contested the 15-percent minority interest discount as claimed on petitioner's gift tax return.  Accordingly, we hold that the stipulated value of the bank stock on the date of petitioner's gifts ($932,219) is subject to a 15-percent minority interest discount for the gifts to his sons of undivided interests.

F.  Summary and Conclusion

On the basis of all the evidence in the record, we conclude and hold that petitioner made separate gifts to each of his two sons of 25-percent undivided interests in the leased land and the bank stock.  The value of the total separate gifts to each son is

---

[28] On brief, petitioner argues that because Lipscomb (and by extension Dilmore) selected valuation discounts based upon a 50-percent undivided interest in the leased land, as opposed to a 25-percent undivided interest, their recommended valuation discounts are understated.  Petitioner also argues that various other cases have allowed fractional-interest discounts greater than those recommended by petitioner's own experts.  We must determine the applicable valuation discount on the basis of the facts in the record before us.  Here, petitioner has presented no concrete, convincing evidence as to what additional amount of discount, if any, should be attributable to a 25-percent undivided interest as opposed to a 50-percent undivided interest.

$358,973, and the value of petitioner's aggregate gifts is
$717,946, calculated as follows:

Leased Land

| | |
|---|---:|
| 1991 present value of lease income | $566,773 |
| 1991 present value of 2023 reversion | 190,291 |
| Combined present value | 757,064 |
| | |
| Pro rata interest | 25% |
| Undiscounted pro rata value | 189,266 |
| Valuation discount adjustment (1-.15) | .85 |
| Value of separate indirect gifts | 160,876 |

Bank Stock

| | |
|---|---:|
| Stipulated value | 932,219 |
| Pro rata interest | 25% |
| Undiscounted pro rata interest | 233,055 |
| Valuation discount adjustment (1-.15) | .85 |
| Value of separate indirect gifts | 198,097 |

Combined Value of Separate Indirect Gifts

| | |
|---|---:|
| Leased land | 160,876 |
| Bank stock | 198,097 |
| Total | 358,973 |

Total Indirect Gifts

| | |
|---|---:|
| John | 358,973 |
| William | 358,973 |
| | 717,946 |

We have considered all other arguments the parties have
advanced for different results.  Arguments not expressly
addressed herein we conclude are irrelevant, moot, or without
merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.

Reviewed by the Court.

WELLS, CHABOT, COHEN, PARR, WHALEN, COLVIN, HALPERN,
CHIECHI, LARO, and GALE, JJ., agree with this majority opinion.

WHALEN, J., concurring: I agree with both the reasoning and result of the majority opinion, but I write separately to make the point that this case does not present the same issues concerning the valuation of the indirect gifts as were presented in Estate of Bosca v. Commissioner, T.C. Memo. 1998-251, and to comment on the position of Judges Beghe and Ruwe, who make interesting and worthwhile points, especially in light of the increasing use of family partnerships.

In this case, the majority opinion decides two principal issues. First, it rejects petitioner's contention that the transfers of leased land and bank stock made by petitioner should be characterized as gifts to petitioner's two sons of minority interests in a family partnership, or as enhancements of his sons' existing partnership interests. Petitioner sought that characterization of the transfers to justify the application of substantial discounts in valuing the property. Contrary to petitioner's position, the majority characterizes the transfers as indirect gifts to the sons of the leased land and bank stock. The majority relies on section 25.2511-1(h)(1), Gift Tax Regs., which provides:

> A transfer of property by B to a corporation generally
> represents gifts by B to the other individual
> shareholders of the corporation to the extent of their
> proportionate interests in the corporation.

Based thereon, the majority holds that the transfers represent an indirect gift to each of petitioner's two sons of an undivided 25-percent interest in the leased land and bank stock. To my

knowledge, there is no disagreement as to this aspect of the majority opinion.

Second, the majority opinion values the two gifts made by petitioner. In the case of the bank stock, the parties stipulated that before the transfer to the partnership the aggregate value of the stock of the three banks that was included in the transfer was $932,219. In view of the fact that the stock of each of the three banks represented a minority interest in the bank, the majority reduced or discounted the value of the stock by 15 percent. This discount was claimed on petitioner's gift tax return, and respondent did not contest it in these proceedings. There is nothing to suggest that the amount of this discount would vary depending on whether the gifts were valued in the aggregate or separately. The majority then, in effect, treats 50 percent of the remaining value as having been retained by petitioner through his interest in the family partnership and treats 25 percent of the remaining value, $198,097, as a gift to each son in accordance with section 25.2511-1(h)(1).

In the case of the leased land, after resolving various factual disputes between and among the parties' expert witnesses, the majority opinion concludes that the present value of the leased land, before the transfer to the partnership, was $757,064. In view of the fact that the gifts made by petitioner were gifts of undivided interests in the leased land, the majority agrees that the value of the leased land should be reduced or discounted by 15 percent due to the fact that the

donees did not have complete control over the property.   In footnote 28 of the opinion, the majority notes that the 15-percent discount is based upon "a 50-percent undivided interest in the leased land, as opposed to a 25-percent undivided interest" due  to petitioner's failure to provide evidence as to "what additional amount of discount, if any, should be attributable to a 25-percent undivided interest as opposed to a 50-percent undivided interest."   Thus, based upon the record at trial, the same discount is applicable regardless of whether the gifts of the leased land are valued on an aggregate basis or separately.   The majority opinion then, in effect, treats 50 percent of the remaining value as having been retained by petitioner through his interest in the partnership and treats 25 percent of the remaining value, $160,876, as a gift to each son in accordance with section 25.2511-1(h)(1).

The majority opinion, at page 23, states as follows:

> We have not, however, aggregated the separate, indirect gifts to his sons, John and William.  See Estate of Bosca v. Commissioner, T.C. Memo. 1998-251 (for purposes of the gift tax, each separate gift must be valued separately), and cases cited therein; cf. Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981) (rejecting family attribution in valuing stock for estate tax purposes).

As the author of the Estate of Bosca v. Commissioner, I appreciate the approval of that opinion by the majority. However, the approach of the majority in the instant case, as discussed above, is different from the approach used in Estate of

Bosca because, in this case, there is no difference between the valuation of petitioner's gifts to his sons depending on whether the gifts are valued on an aggregate basis or separately. The value of 50 percent of the gifted property, or $378,532 (50 percent of $757,064), less a 15-percent discount is the same as two 25-percent undivided interests in the leased land, $378,532, less a 15-percent discount.

In valuing the gifts in Estate of Bosca, it was necessary for the Court to decide whether the gifts should be valued on an aggregate basis; i.e., as part of a 50-percent block of stock, or whether they should be valued separately; i.e., as two 25-percent blocks of stock. In deciding to take the latter approach, we followed the long-standing position of this Court that separate gifts must be valued separately. See, e.g., Calder v. Commissioner, 85 T.C. 713 (1985); Rushton v. Commissioner, 60 T.C. 272, 278 (1973), affd. 498 F.2d 88 (5th Cir. 1974); Standish v. Commissioner, 8 T.C. 1204 (1947); Phipps v. Commissioner, 43 B.T.A. 1010-1022 (1941), affd. 127 F.2d 214 (10th Cir. 1942); Hipp v. Commissioner, T.C. Memo. 1983-746.

As I understand their position, Judges Ruwe and Beghe agree that, under the facts of this case, petitioner made a gift to each of his two sons, but they do not agree with the approach used by the majority in valuing the gifts. They appear to take the position that in computing the difference between the value of the property transferred by the donor and the value of the consideration received by the donor, as required by section

2512(b), the property is to be valued in the donor's hands prior to the transaction with no discounts or reductions permitted.

For example, in the case of the leased land, the only asset as to which respondent has raised an issue in this case, it appears that Judges Ruwe and Beghe take the position that the value of the property in the donor's hands before the transfer, $757,064, must also be the value of the property transferred by the donor. Presumably, they would take the position that the value of the consideration received by the donor is 50 percent of the value of the property transferred or $378,532, based upon the fact that petitioner retained a 50-percent interest in the partnership. Under this approach the aggregate value of the gifts would be $378,532 and that amount must be included in computing the amount of gifts made by petitioner during the calendar year. Thus, they disagree that a discount of 15 percent is proper to reflect the reduced value of undivided interests in the leased land.

Their view appears to be at odds with the fact that discounts and reductions are permitted in the case of direct gifts. If a donor makes a direct gift to one or more donees, the sum of the gifts may be less than the value of the property in the donor's hands before the transfer. For example, we have held that the sum of all the fractional interests in real property gifted by a donor was less than the value of the whole property in the donor's hands. In Mooneyham v. Commissioner, T.C. Memo. 1991-178, the donor owned 100 percent of a certain parcel of real

property worth $1,302,000 before transferring a 50-percent undivided interest in the property to her brother. We held that the value of the gift, the 50-percent fractional interest, was "50 percent of the total less a 15-percent discount or $553,350." Thus, the property transferred by the donor was worth $97,650 less than it was in the donor's hands. Similarly, in Estate of Williams v. Commissioner, T.C. Memo. 1998-59, the owner of two parcels of property transferred 50-percent undivided interests in each of the parcels. We held that each of the two gifts in that case should be valued as 50 percent of the fair market value of the property less aggregate discounts of 44 percent. See also Heppenstall v. Commissioner, a Memorandum Opinion of this Court dated Jan. 31, 1949 (minority discount). These cases show that, in appropriate cases, the minority discount and fractionalized interest discount can be taken into account for purposes of valuing direct gifts under section 2512(a). This suggests that such discounts can also be taken into account in valuing indirect gifts under section 2512(b). Otherwise, there would be a difference in the application of the willing buyer, willing seller standard depending on whether the valuation is of a direct gift or an indirect gift.

As described above, in valuing the gifts of bank stock, the majority opinion applied a minority interest discount to reflect the fact that a willing buyer would pay less for the minority interests in the three banks that petitioner transferred. In valuing the leased land, the majority opinion applied a

fractional interest discount to reflect the fact that a willing buyer would pay less for the undivided interest in the leased land that petitioner transferred.  These discounts are attributable to the nature of the property transferred by the donor.  They  are not attributable to restrictions imposed by the terms of the conveyance.  See <u>Citizens Bank & Trust Co. v. Commissioner</u>, 839 F.2d 1249 (7th Cir. 1988).  In my view, neither of these discounts is inconsistent with section 25.2511-2(a), Gift Tax Regs., and the corresponding case law which require that the gift be measured by the value of the property passing from the donor, and not by what the  donee receives. See, e.g., <u>Ahmanson Found. v. United States</u>, 674 F.2d 761, 767-769 (9th Cir. 1981).

CHABOT, COLVIN, HALPERN, and THORNTON, <u>JJ.</u>, agree with this concurring opinion.

HALPERN, J., concurring:  I write to state my agreement with the majority opinion and to respond to the suggestion that in allowing a fractional interest discount with respect to the leased land, the majority opinion has deviated from the valuation rule of section 2512(b).  The threshold question under section 2512(b) is what "property is transferred".  As germane to the facts of the case under review, the question is whether petitioner's transfer of land to the partnership should be deemed to represent a single transfer of petitioner's 100-percent interest in the land, or whether it should be viewed as separate, indirect transfers of fractional interests to his two sons.

The instant case, like Kincaid v. United States, 682 F.2d 1220 (5th Cir. 1982), is based on application of an indirect gift rule as provided in the regulations:  "A transfer of property by B to a corporation [for less than full and adequate consideration] generally represents gifts by B to the other shareholders of the corporation to the extent of their proportionate interests in the corporation."  Gift Tax Regs. sec. 25.2511-1(h)(1) (emphasis added).  Applying this regulation, the court in Kincaid concluded that the taxpayer's single transfer of a ranch to the family-owned corporation represented "a gift to each of her sons" to the extent of their proportionate interests.  Id. at 1224.  Given the unambiguous premise of the cited regulation, as applied in Kincaid, that the transfer gives rise to separate "gifts", it follows that for purposes of valuing those separate gifts, the "property transferred" should be viewed

as the property transferred by virtue of each of the deemed separate gifts.  Otherwise, we must construe section 2512(b) to apply not on a gift-by-gift basis, but on the basis of aggregate gifts made by the donor to different donees--a result without basis in law or common sense.

It would seem beyond cavil that if the petitioner had made direct gifts to his sons of 25-percent undivided interests in the land, we would permit appropriate fractional interest discounts in valuing the gifts.  It would be anomalous if by making the same gifts indirectly, through a partnership, instead of directly, such fractional interest discounts were precluded. Having applied the indirect gift rule to deny the donor entity-level discounts on the basis that the transfer to the entity was in essence multiple transfers to the individual objects of the donor's bounty, it would be unfair then to ignore the operation of that rule in concluding that in considering the availability of a fractional interest discount, the transfer should be treated as a unitary transfer to the entity.

Finally, it is true, as Judge Ruwe notes, that neither Kincaid nor several of its progeny allowed any fractional interest discount with respect to the transferred property. There is no indication in any of these cases, however, that the taxpayer raised or that the court considered such an issue.  The only case in the Kincaid line of cases to expressly consider the issue was Estate of Bosca v. Commissioner, T.C. Memo. 1998-251, which concluded, consistent with the majority opinion, that

fractional interest discounts were permissible.  I see no reason why we should now abandon this precedent, which is soundly reasoned.

CHABOT, COHEN, WHALEN, COLVIN, LARO, GALE, and THORNTON, JJ., agree with this concurring opinion.

RUWE, J., concurring in part and dissenting in part:  I agree with the majority opinion except for its allowance of a 15-percent valuation discount with respect to what the majority describes as "indirect gifts [by petitioner] to each of his sons, John and William, of undivided 25-percent interests in the leased land".  Majority op. p. 22.  In my opinion, no such discount is appropriate because undivided interests in the leased land were never transferred to petitioner's sons.  The transfer in question was a transfer of petitioner's entire interest in the leased land to the partnership.  This transfer was to a partnership in which petitioner held a 50-percent interest.  Except for enhancing the value of petitioner's 50-percent partnership interest, he received no other consideration for the transfer.

Section 2512(b) provides:

SEC. 2512.  Valuation of Gifts.

     (b) Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year.

The Supreme Court has described previous versions of the gift tax statutes (section 501 imposing the tax on gifts and section 503 which is virtually identical to present section 2512(b)) in the following terms:

Sections 501 and 503 are not disparate provisions. Congress directed them to the same purpose, and they should not be separated in application. Had Congress taxed "gifts" simpliciter, it would be appropriate to assume that the term was used in its colloquial sense, and a search for "donative intent" would be indicated. But Congress intended to use the term "gifts" in its broadest and most comprehensive sense. H. Rep. No. 708, 72d Cong., 1st Sess., p.27; S. Rep. No. 665, 72d Cong., 1st Sess., p.39; cf. Smith v. Shaughnessy, 318 U.S. 176; Robinette v. Helvering, 318 U.S. 184. Congress chose not to require an ascertainment of what too often is an elusive state of mind. For purposes of the gift tax it not only dispensed with the test of "donative intent." It formulated a much more workable external test, that where "property is transferred for less than an adequate and full consideration in money or money's worth," the excess in such money value "shall, for the purpose of the tax imposed by this title, be deemed a gift..." And Treasury Regulations have emphasized that common law considerations were not embodied in the gift tax. [Commissioner v. Wemyss, 324 U.S. 303, 306 (1945); fn. ref. omitted.]

The Supreme Court described the objective of these statutory provisions as follows:

The section taxing as gifts transfers that are not made for "adequate and full [money] consideration" aims to reach those transfers which are withdrawn from the donor's estate. * * * [Id. at 307.]

Under the applicable statutory provisions, it is unnecessary to consider the value of what petitioner's sons received in order to determine the value of the property that was transferred. Indeed, the regulations provide that it is not even necessary to identify the donee.[1] The regulations provide that the gift tax

_____

[1]Sec. 25.2511-2(a), Gift Tax Regs.:

SEC. 25.2511-2. Cessation of donor's dominion and control. (a) The gift tax is not imposed upon the receipt of the property by the donee, nor is it necessarily determined by the measure of enrichment

(continued...)

is the primary and personal liability of the donor, that the gift is to be measured by the value of the property passing from the donor, and that the tax applies regardless of the fact that the identity of the donee may not be presently known or ascertainable.  See sec. 25.2511-2(a), Gift Tax Regs.[2]

The majority correctly states the formula for valuing transfers of property:

> If property is transferred for less than adequate and full consideration, then the excess of the value of the property transferred over the consideration received is generally deemed a gift.  See sec. 2512(b).  The gift is measured by the value of the property passing from the donor, rather than by the property received by the donee or upon the measure of enrichment to the donee.  See sec. 25.2511-2(a), Gift Tax Regs.  [Majority op. pp. 11-12.]

This is exactly the formula used in the cases on which the majority relies for the proposition that a gift was made.  See Kincaid v. United States, 682 F.2d 1220 (5th Cir. 1982); Heringer

---

[1](...continued)
resulting to the donee from the transfer, nor is it conditioned upon ability to identify the donee at the time of the transfer.  On the contrary, the tax is a primary and personal liability of the donor, is an excise upon his act of making the transfer, is measured by the value of the property passing from the donor, and attaches regardless of the fact that the identity of the donee may not then be known or ascertainable.

[2]See also Robinette v. Helvering, 318 U.S. 184 (1943), in which the taxpayer argued that there could be no gift of a remainder interest where the putative remaindermen (prospective unborn children of the grantor) did not exist at the time of the transfer.  The Supreme Court rejected this argument stating that the gift tax is a primary and personal liability of the donor measured by the value of the property passing from the donor and attaches regardless of the fact that the identity of the donee may not be presently known or ascertainable.

v. Commissioner, 235 F.2d 149 (9th Cir. 1956); Ketteman Trust v. Commissioner, 86 T.C. 91 (1986). In each of these cases, property was transferred to a corporation for less than full consideration. All or part of the stock of the transferee corporations was owned by persons other than the transferor. In each case, the value of the gift was found to be the fair market value of the property transferred to the corporation, minus any consideration received by the transferor. None of these cases allowed a discount based upon a hypothetical assumption that fractionalized interests in the transferred property were given to the individual shareholders of the transferee corporations. Unfortunately, the majority does not follow its own formula, as quoted above, or the above-cited cases.

The only case cited by the majority where a discount was given based on a hypothetical assumption that fractionalized interests in the transferred property were given to the indirect beneficiaries (shareholders or partners) is Estate of Bosca v. Commissioner, T.C. Memo. 1998-251. I believe that Estate of Bosca was incorrectly decided on this point. That opinion improperly relied upon cases that dealt with determining the number of annual gift tax exclusions and blockage discounts.

Opinions dealing with the number of annual gift tax exclusions under section 2503(b)[3] have no application in

---

[3]Sec. 2503(b) provides in part:

        SEC. 2503(b). Exclusions From Gifts.--In the case
(continued...)

determining the value of gifts under section 2512(b). Under the annual gift tax exclusion, the first $10,000 of gifts made to any person is excluded from total taxable gifts. Unlike section 2512(b), section 2503(b) focuses on the identity of the donee. Section 2503(b) specifically addresses "gifts * * * made to any person" and excludes "the first $10,000 of such gifts to such person". In explaining the meaning of "gift" in the statute providing for the annual exclusion, the Supreme Court explained:

> But for present purposes it is of more importance that in common understanding and in the common use of language a gift is made to him upon whom the donor bestows the benefit of his donation. One does not speak of making a gift to a trust rather than to his children who are its beneficiaries. The reports of the committees of Congress used words in their natural sense and in the sense in which we must take it they were intended to be used in § 504(b) when, in discussing § 501, they spoke of the beneficiary of a gift upon trust as the person to whom the gift is made.* * * Helvering v. Hutchings, 312 U.S. 393, 396 (1941).

The Supreme Court's interpretation of the term "gift" for purposes of the annual exclusion was based upon the common meaning and understanding of the term gift. The Supreme Court's interpretation of the term gift in section 2503(b) must be contrasted with the Supreme Court's broad interpretation of

---

³(...continued)
of gifts (other than gifts of future interests in property) made to any person by the donor during the calendar year, the first $10,000 of such gifts to such person shall not, for purposes of subsection (a), be included in the total amount of gifts made during such year. * * *

section 2512(b).  Section 2512(b) specifies a formula for determining when a transfer will be deemed a gift and for determining the amount of the gift for gift tax purposes.  In explaining the broad reach of the predecessor of section 2512(b), the Supreme Court in Commissioner v. Wemyss, 324 U.S. 303 (1945), explained that Congress was applying the gift tax to transfers that were beyond the common meaning of the term gift.

> Had Congress taxed "gifts" simpliciter, it would be appropriate to assume that the term was used in its colloquial sense, and a search for "donative intent" would be indicated.  But Congress intended to use the term "gifts" in its broadest and most comprehensive sense. * * * [Id. at 306.]

Thus, for purposes of the gift tax, a transfer that is deemed to be a "gift" is statutorily defined in section 2512(b) in broad and comprehensive terms and is not limited to the common meaning of that term.

Reliance on cases based on blockage discounts is also misplaced in the context of section 2512(b).  The gift tax regulations permit an exception to the traditional definition of fair market value for gifts of large blocks of publicly traded stock.  Under the regulations, a blockage discount can be allowed "If the donor can show that the block of stock to be valued, with reference to each separate gift, is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market."  Sec. 25.2512-2(e), Gift Tax Regs.  (Emphasis added.)  The cases dealing with blockage discounts are distinguishable because they

were decided on the basis of a specific regulation dealing with blockage discounts and involved either separate transfers of properties to various persons or transfers in trust where the transferor allocated specific properties to the trust accounts of individual donees. See Rushton v. Commissioner, 498 F.2d 88 (5th Cir. 1974), affg. 60 T.C. 272 (1973); Calder v. Commissioner, 85 T.C. 713 (1985). In the instant case, there was a single transfer of petitioner's property for less than full and adequate consideration. Pursuant to section 2512(b), such a transfer is deemed to be a gift to the extent the fair market value of the transferred property exceeded the value of any consideration received by the transferor.

The value of the property to which the gift tax applies in the instant case is the fair market value of the leased property that petitioner transferred to the partnership, minus the portion of that value that served to enhance petitioner's 50-percent partnership interest. See Kincaid v. United States, supra at 1224; Heringer v. Commissioner, 235 F.2d at 152-153;[4] Ketteman Trust v. Commissioner, 86 T.C. at 104. There is nothing in that formula that would justify a discount for two 25-percent

---

[4]In Heringer v. Commissioner, 235 F.2d 149 (9th Cir. 1956), the taxpayers held a 40-percent interest in the corporation to which they transferred property. The taxpayers argued that any gift should not exceed 60-percent of the value of the transferred property because the taxpayers' 40-percent stock interest was increased proportionately by the transfer and that such increase was analogous to receipt of consideration. The Court of Appeals agreed citing sec. 1002, 1939 I.R.C., which contains the same language as the current version of sec. 2512(b). See id. at 152-153.

undivided interests in the leased property.  Petitioner never transferred 25-percent fractional interests in the leased property.  His sons never received or owned 25-percent undivided interests in the leased property.  Indeed, no such fractionalized interests ever existed.  After the transfer, the partnership held the same property interest that petitioner held before the transfer; there was no fractionalization of ownership; and the partnership could have sold the leased property for the same fair market value that petitioner could have realized.  Nevertheless, the majority values the leased property by giving a discount for hypothetical fractional interests that never existed.  On this point, the majority is in error.

VASQUEZ and MARVEL, JJ., agree with this concurring in part and dissenting in part opinion.

BEGHE, J., concurring in part and dissenting in part: I concur in the majority's conclusion that, in computing the value of the gifts, the donor is not entitled to entity level discounts; I dissent from the majority's conclusion that petitioner's transfer of the leased land should be valued as separate indirect transfers to his sons of individual 25-percent interests, rather than as a unitary transfer to the partnership.[1]

With all the woofing these days about using family partnerships to generate big discounts, the majority opinion provides salutary reminders that the "gift is measured by the value of the property passing from the donor, rather than by the property received by the donee or upon the measure of enrichment of the donee", majority op. pp. 11-12, and that "How petitioner's transfers of the leased land and bank stock may have enhanced the sons' partnership interests is immaterial, for the gift tax is imposed on the value of what the donor transfers, not what the donee receives", majority op. p. 16 (citing section 25.2511-2(a),

_____

[1] Although the majority describe the gifts as "undivided 25-percent interests in the leased land", majority op. p. 22, the 15-percent discounts allowed by the majority in valuing those interests amount to no more than the discount petitioner's experts attributed to the transfer of a 50-percent interest. This is because petitioner's experts "presented no concrete, convincing evidence as to what additional amount of discount, if any, should be attributable to a 25-percent undivided interest as opposed to a 50-percent undivided interest". Majority op. note 28. For an example of an agreement by the parties as to the difference in value between a transfer of a 50-percent block and two 25-percent blocks of the stock of a closely held corporation, see Estate of Bosca v. Commissioner, T.C. Memo. 1998-251.

Gift Tax Regs., <u>Robinette v. Helvering</u>, 318 U.S. 184, 186 (1943), and other cases therein); see also sec. 25.2512-8, Gift Tax Regs.

This is the "estate depletion" theory of the gift tax[2], given its most cogent expression by the Supreme Court in <u>Commissioner v. Wemyss</u>, 324 U.S. 303, 307-308 (1945):

> The section taxing as gifts transfers that are not made for "adequate and full [money] consideration" aims to reach those transfers that are withdrawn from the donor's estate.  To allow detriment to the donee to satisfy the requirement of "adequate and full consideration" would violate the purpose of the statute and open wide the door for evasion of the gift tax.  See 2 Paul, <u>supra</u> [Federal Estate and Gift Taxation (1942)] at 1114.[3]

The logic and the sense of the estate depletion theory require that a donor's simultaneous or contemporaneous gifts to or for the objects of his bounty be unitized for the purpose of

---

[2] See, e.g., Lowndes et al., Federal Estate and Gift Taxes 356 (1974); Solomon et al., Federal Taxation of Estates, Trusts and Gifts 191 (1989).

[3] The Paul treatise, cited twice with approval in <u>Commissioner v. Wemyss</u>, 324 U.S. 307, 308 (1948), put it this way:

> It is Congress's intention to reach donative transfers which diminish the taxpayer's estate.  The existence of "an adequate and full consideration in money or money's worth" which is not received by the taxpayer has that very same effect.  Since the section is aimed essentially at "colorable family contracts and similar undertakings made as a cloak to cover gifts," it is fair to assume that Congress intended to exempt transfers only to the extent that the taxpayer's estate is simultaneously replenished. The consideration may thus augment his estate, give him a new right or privilege, or discharge him from liability.  [2 Paul, Federal Estate and Gift Taxation, 1114-1115 (1942); citations omitted.]

valuing the transfers under section 2511(a).  After all, the gift tax was enacted to protect the estate tax, and the two taxes are to be construed in pari materia.  See Merrill v. Fahs, 324 U.S. 308, 313 (1945).  The estate and gift taxes are different from an inheritance tax, which focuses on what the individual donee-beneficiaries receive; the estate and gift taxes are taxes whose base is measured by the value of what passes from the transferor.

I would hold, contrary to the majority and the approach of Estate of Bosca v. Commissioner, T.C. Memo. 1998-251,[4] that the gross value of what petitioner transferred in the case at hand is to be measured by including the value of his entire interest in the leased land.[5]  I would then value the net gifts by

---

[4] Contrary also to the Commissioner's concession, in Rev. Rul. 93-12, 1993-1 C.B. 202, that a donor's simultaneous equal gifts aggregating 100 percent of the stock of his wholly owned corporation to his five children are to be valued for gift tax purposes without regard to the donor's control and the family relationship of the donees.  The ruling is wrong because it focuses on what was received by the individual donees; what is important is that the donor has divested himself of control.  The cases relied upon by the ruling--Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981); Propstra v. United States, 680 F.2d 1248 (9th Cir. 1982); Estate of Andrews v. Commissioner, 79 T.C. 938 (1982); Estate of Lee v. Commissioner, 69 T.C. 860 (1978)--address an arguably different question:  whether for estate tax purposes a decedent's transfer at death of interests in real property or shares of a family corporation should be valued by aggregating them with interests in the same property or shares already held by the decedent's spouse or siblings.

[5] I acknowledge that my sense of the logic of the estate depletion theory would require unitization of a donor's same day gifts of the stock of the same corporation in determining the significance of parting with but not conveying control, contrary to Estate of Heppenstall v. Commissioner, a Memorandum Opinion of this Court dated Jan. 31, 1949, and arguably contrary to cases that segregate same day gifts for blockage discount purposes,
(continued...)

subtracting from the gross value so arrived at the value, at the end of the figurative day, of the partnership interest that petitioner received back and retained, sec. 2512(b),[6] not 50 percent of the value of the leased land that he transferred to the partnership.

[5](...continued)
see, e.g., Rushton v. Commissioner, 498 F.2d 88 (5th Cir. 1974), affg. 60 T.C. 272 (1973); Calder v. Commissioner, 85 T.C. 713 (1985), which may be attributed to the presence of a specifically targeted regulation. In any event, my sense of what the estate depletion theory implies for gift tax purposes is consistent with and supported by the rule that unitizes a block of shares held at death to determine the value at which they are included in the gross estate, notwithstanding that they may be bequeathed to more than one beneficiary. See, e.g., Ahmanson Found. v. United States, 674 F.2d 761, 768 (9th Cir. 1981); Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1582 (1987).

[6] I see no problem in harmonizing the above-suggested approach with the considerations that apply in determining whether a gift qualifies as a present interest rather than future interest for the purpose of the annual exclusion under sec. 2503(b). The annual exclusion inquiry necessarily focuses on the quality and quantity of the donee's interest. See Stinson Estate v. United States, 214 F.3d 846 (7th Cir. 2000); sec. 25.2503-3, Gift Tax Regs.; see also Helvering v. Hutchings, 312 U.S. 393 (1941); Estate of Cristofani v. Commissioner, 97 T.C. 74 (1991). Analogous considerations apply in computing the value of bequests entitled to the estate tax charitable or marital deduction. See, e.g., Ahmanson Found. v. United States, supra; Estate of Chenoweth v. Commissioner, supra.

FOLEY, <u>J</u>., dissenting:  The majority relies on <u>Kincaid v. United States</u>, 682 F.2d 1220, 1226 (5th Cir. 1982), where the court held that Mrs. Kincaid made a gift through an "unequal exchange [that] served to enhance the value of her sons' voting stock".  The opinion, however, states:  "Nor do we agree with petitioner's contention that his transfers should be characterized as enhancements of his sons' existent partnership interests."  Majority op. p. 16.  The holding in this case is premised on <u>Kincaid</u>.  The majority opinion, however, rejects petitioner's contention, which is the essence of the <u>Kincaid</u> holding, and fails to explain why the result in this case should be different from that in <u>Kincaid</u>.  Accordingly, I respectfully dissent.