116 T.C. No. 11

UNITED STATES TAX COURT

ESTATE OF W.W. JONES II, DECEASED, A.C. JONES IV, INDEPENDENT
EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13926-98.                    Filed March 6, 2001.

D formed a family limited partnership (JBLP) with
his son and transferred assets including real property,
to JBLP in exchange for a 95.5389-percent limited
partnership interest. D also formed a family limited
partnership (AVLP) with his four daughters and
transferred real property to AVLP in exchange for an
88.178-percent limited partnership interest. D's son
contributed real property in exchange for general and
limited partnership interests in JBLP, and the
daughters contributed real property in exchange for
general and limited partnership interests in AVLP. All
of the contributions were properly reflected in the
capital accounts of the contributing partners.
Immediately after formation of the partnerships, D
transferred by gift an 83.08-percent limited
partnership interest in JBLP to his son and a
16.915-percent limited partnership interest in AVLP to
each of his daughters.

Held:  The transfers of property to the partnerships were not taxable gifts.  See Estate of Strangi v. Commissioner, 115 T.C. 478 (2000).

Held, further, sec. 2704(b), I.R.C., does not apply to this transaction.  See Kerr v. Commissioner, 113 T.C. 449 (1999).

Held, further, the value of D's gift to his son was 83.08-percent of the value of the underlying assets of JBLP, reduced by a lack-of-marketability (8%) discount.  The value of D's gift to each of his daughters was 16.915 percent of the value of the underlying assets of AVLP, reduced by secondary market (40%) and lack-of-marketability (8%) discounts.

Held, further, the gifts of limited partnership interests are not subject to additional lack-of-marketability discounts for built-in capital gains. Estate of Davis v. Commissioner, 110 T.C. 530 (1998), distinguished.

William R. Cousins III, Robert Don Collier, Robert M. Bolton, and Todd A. Kraft, for petitioner.

Deborah H. Delgado and Gerald L. Brantley, for respondent.

COHEN, Judge:  Respondent determined a deficiency of $4,412,527 in the 1995 Federal gift tax of W.W. Jones II.  The issues for decision are (alternatively):  (1) Whether the transfers of assets on formation of Jones Borregos Limited Partnership (JBLP) and Alta Vista Limited Partnership (AVLP) (collectively, "the partnerships") were taxable gifts pursuant to section 2512(b); (2) whether the period of limitations for assessment of gift tax deficiency arising from gifts on formation

is closed; (3) whether restrictions on liquidation of the partnerships should be disregarded for gift tax valuation purposes pursuant to section 2704(b); and (4) the fair market value of interests in the partnerships transferred by gift after formation. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect on the date of the transfers, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. W.W. Jones II (decedent), resided in Corpus Christi, Texas, at the time the petition in this case was filed. Decedent subsequently died on December 17, 1998, and a motion to substitute the estate of W.W. Jones II, deceased, A.C. Jones IV, independent executor, as petitioner was granted. The place of probate of decedent's estate is Nueces County, Texas. At the time of his appointment as executor, A.C. Jones IV (A.C. Jones), also resided in Nueces County, Texas.

For most of his life, decedent worked as a cattle rancher in southwest Texas. Decedent had one son, A.C. Jones, and four daughters, Elizabeth Jones, Susan Jones Miller, Kathleen Jones Avery, and Lorine Jones Booth.

During his lifetime, decedent acquired, by gift or bequest, the surface rights to several large ranches, including the Jones Borregos Ranch, consisting of 25,669.49 acres, and the Jones Alta Vista Ranch, consisting of 44,586.35 acres. These ranches were originally acquired by decedent's grandfather and have been held by decedent's family for several generations. The land on these ranches is arid natural brushland, and commercial uses include raising cattle and hunting.

Motivated by his desire to keep the ranches in the family, decedent became involved in estate planning matters beginning in 1987. In 1994, decedent's certified public accountant suggested that decedent use partnerships as estate and business planning tools. Following up on this suggestion, A.C. Jones prepared various projections for decedent concerning a hypothetical transfer of the ranches to partnerships and the discounted values that would attach to the partnership interests for gift tax purposes.

A.C. Jones, Elizabeth Jones, Susan Jones Miller, Kathleen Jones Avery, and Lorine Jones Booth each owned a one-fifth interest in the surface rights of the Jones El Norte Ranch. They acquired this ranch by bequest from decedent's aunt in 1979. The Jones El Norte Ranch was also originally owned by decedent's grandfather and has also been owned by decedent's extended family for several generations.

Effective January 1, 1995, decedent and A.C Jones formed JBLP under Texas law.  Decedent contributed the surface estate of the Jones Borregos Ranch, livestock, and certain personal property in exchange for a 95.5389-percent limited partnership interest.  The entire contribution was reflected in the capital account of decedent.  A.C. Jones contributed his one-fifth interest in the Jones El Norte Ranch in exchange for a 1-percent general partnership interest and a 3.4611-percent limited partnership interest.

On January 1, 1995, the same day that the partnership was effectively formed, decedent gave to A.C. Jones an 83.08-percent interest in JBLP, leaving decedent with a 12.4589-percent limited partnership interest.  Decedent used a document entitled "Gift Assignment of Limited Partnership Interest" to carry out the transfer.  The document stated that decedent intends that A.C. Jones receive the gift as a limited partnership interest.

Federal income tax returns for 1995, 1996, 1997, and 1998 were filed for JBLP and signed by A.C. Jones as tax matters partner.  Attached to each return were separate Schedules K-1 for each general partnership interest and each limited partnership interest.  The Schedules K-1 for the limited partnership interest of A.C. Jones included the interest in partnership received by gift from decedent.

Also effective January 1, 1995, decedent and his four daughters formed AVLP under Texas law. Decedent contributed the surface estate of the Jones Alta Vista Ranch in exchange for an 88.178-percent limited partnership interest. The contribution was reflected in decedent's capital account. Susan Jones Miller and Elizabeth Jones each contributed their one-fifth interests in the Jones El Norte Ranch in exchange for 1-percent general partnership interests and 1.9555-percent limited partnership interests, and Kathleen Jones Avery and Lorine Jones Booth each contributed their one-fifth interest in the Jones El Norte Ranch in exchange for 2.9555-percent limited partnership interests. The following chart summarizes the ownership structure of AVLP immediately after formation:

| Partner | Percentage | Interest |
| --- | --- | --- |
| Elizabeth Jones | 1.0 | General |
| | 1.9555 | Limited |
| Susan Jones Miller | 1.0 | General |
| | 1.9555 | Limited |
| Kathleen Jones Avery | 2.9555 | Limited |
| Lorine Jones Booth | 2.9555 | Limited |
| Decedent | 88.178 | Limited |

On January 1, 1995, the same day that the partnership was effectively formed, decedent gave to each of his four daughters a 16.915-percent interest in AVLP, leaving decedent with a 20.518-percent limited partnership interest. Decedent used four separate documents, one for each daughter, entitled "Gift Assignment of Limited Partnership Interest" to carry out the

transfers.  Each document stated that decedent intended for his daughters to receive the gifts as limited partnership interests.

Federal income tax returns for 1995, 1996, 1997, and 1998 were filed for AVLP and signed by Elizabeth Jones as tax matters partner.  Attached to each return were separate Schedules K-1 for each general partnership interest and each limited partnership interest.  The Schedules K-1 for each daughter's limited partnership interest included the partnership interest received by gift from decedent.

Decedent's attorney drafted the partnership agreements of both JBLP and AVLP with the intention of creating substantial discounts for the partnership interests that were transferred by gift.  Both partnership agreements set forth conditions for when an interest that is transferred by gift or by other methods may convert to a limited partnership interest.  Section 8.3 of the JBLP agreement provides that the general partner and 100 percent of the limited partners must approve the conversion to a limited partnership interest in writing, and section 8.3 of the AVLP agreement provides that the general partners and 75 percent of the remaining limited partners must approve the conversion in writing.  Both agreements also require that an assignee execute a writing that gives assurances to the other partners that the assignee has acquired such interest without the intention to distribute such interest, and the assignee must execute a

counterpart to the partnership agreement adopting the conditions therein.

Sections 8.4 and 8.5 of the partnership agreements provide that, before a partner may transfer an interest in the partnerships to anyone other than decedent or any lineal descendant of decedent, the partnership or remaining partners shall have the option to purchase the partnership interest for the lesser of the agreed upon sales price or appraisal value. The partnership may elect to pay the purchase price in 10 annual installments with interest set at the minimum rate allowed by the rules and regulations of the Internal Revenue Service.

Section 9.2 of the agreements provides that the partnerships will continue for a period of 35 years. Section 9.3 provides that a limited partner will not be permitted to withdraw from the partnership, receive a return of contribution to capital, receive distributions in liquidation, or redemption of interest except upon dissolution, winding up, and termination of the partnership.

Section 9.4 of the partnership agreements provides for the removal of a general partner and the dissolution of the partnership. The AVLP agreement provides that a general partner may be removed at any time by the act of partners owning an aggregated 75-percent interest in the partnership. The JBLP agreement provides that a general partner may be removed at any time by the act of the partners owning an aggregated 51-percent

interest in the partnership.  After removal, if there is no remaining general partner, the remaining limited partners shall designate a successor general partner.  If the limited partners fail to designate a successor general partner within 90 days, the partnership will dissolve, affairs will be wound up, and the partnership will terminate.  Except upon dissolution, windup, and termination, both partnership agreements prohibit a limited partner from withdrawing and receiving a return of capital contribution, distribution in liquidation, or a redemption of interest.

Section 5.4 of the AVLP agreement originally provided that the general partners could not sell any real property interest that was owned by the partnership without first obtaining the consent of partners owning a majority interest in the partnership.  This section was later amended so that partners owning 85 percent of the partnership must consent to a sale of real property.

On January 1, 1995, the Jones Alta Vista Ranch had a fair market value of $10,254,860, and the Jones Borregos Ranch, livestock, and personal property that were contributed by decedent to JBLP had a fair market value of $7,360,997.  Neither partnership ever made a section 754 election.  At the time that decedent transferred interests in the partnerships by gift to his children, the net asset values (NAV) of the underlying

partnership assets that were held by AVLP and JBLP were $11,629,728 and $7,704,714, respectively. JBLP and AVLP had bases in their assets of $562,840 and $1,818,708, respectively.

Attached to his 1995 Federal gift tax return, decedent included a valuation report prepared by Charles L. Elliott, Jr. (Elliott), who also testified as the estate's expert at trial. The partnerships were valued on the return and by Elliott at trial using the NAV method on a "minority interest, nonmarketable" basis. Nowhere in his report did Elliott purport to be valuing assignee interests in the partnership. The valuation report arrived at an NAV for the partnerships and then applied secondary market, lack-of-marketability, and built-in capital gains discounts. The expert report concluded that a 66-percent discount from NAV is applicable to the interest in JBLP and that a 58-percent discount is applicable to the interest in AVLP. On the return, decedent reported gifts of "an 83.08 percent limited partnership interest" in JBLP valued at $2,176,864 and a "16.915 percent limited partnership interest" in AVLP to each of his four daughters, valued at $821,413 per interest.

In an affidavit executed on January 12, 1999, A.C. Jones stated that the gifts that he and his sisters received from decedent were "limited partnership interests". The sole activity

of AVLP is the rental of its real property.  AVLP produces an average annual yield of 3.3 percent of NAV.

OPINION

Gift at the Inception of the Partnerships

In an amendment to the answer, respondent contends that decedent made taxable gifts upon contributing his property to the partnerships.  Using the value reported by decedent on his gift tax return, respondent argues that, if decedent gave up property worth $17,615,857 and received back limited partnership interests worth only $6,675,156, decedent made taxable gifts upon the formation of the partnerships equal to the difference in value.

In Estate of Strangi v. Commissioner, 115 T.C. 478, 489-490 (2000), a decedent formed a family limited partnership with his children and transferred assets to the partnership in return for a 99-percent limited partnership interest.  After his death, his estate claimed that, due to lack-of-control and lack-of-marketability discounts, the value of the limited partnership interest was substantially lower than the value of the property that was contributed by the decedent.  The Commissioner argued that the decedent had made a gift when he transferred property to the partnership and received in return a limited partnership interest of lesser value.  The Court held that, because the taxpayer received a continuing interest in the family limited partnership and his contribution was allocated to his own capital

account, the taxpayer had not made a gift at the time of contribution.

In Shepherd v. Commissioner, 115 T.C. 376, 379-381 (2000), the taxpayer transferred real property and stock to a newly formed family partnership in which he was a 50-percent owner and his two sons were each 25-percent owners. Rather than allocating contributions to the capital account of the contributing partner, the partnership agreement provided that any contributions would be allocated pro rata to the capital accounts of each partner according to ownership. Because the contributions were reflected partially in the capital accounts of the noncontributing partners, the value of the noncontributing partners' interests was enhanced by the contributions of the taxpayer. Therefore, the Court held that the transfers to the partnership were indirect gifts by the taxpayer to his sons of undivided 25-percent interests in the real property and stock. See id. at 389.

The contributions of property in the case at hand are similar to the contributions in Estate of Strangi and are distinguishable from the gifts in Shepherd. Decedent contributed property to the partnerships and received continuing limited partnership interests in return. All of the contributions of property were properly reflected in the capital accounts of decedent, and the value of the other partners' interests was not

enhanced by the contributions of decedent.  Therefore, the contributions do not reflect taxable gifts.

Because the contributions do not reflect taxable gifts, we need not decide whether the period of limitations for assessment of a deficiency due to a gift on formation has expired.

Section 2704(b)

Respondent determined in the statutory notice, and argues in the alternative, that provisions in the partnership agreements constitute applicable restrictions under section 2704(b) and must be disregarded when determining the value of the partnership interests that were transferred by gift.

Section 2704(b) generally states that, where a transferor and his family control a partnership, a restriction on the right to liquidate the partnership shall be disregarded when determining the value of the partnership interest that has been transferred by gift or bequest if, after the transfer, the restriction on liquidation either lapses or can be removed by the family.  Section 25.2704-2(b), Gift Tax Regs., provides that an applicable restriction is a restriction on "the ability to liquidate the entity (in whole or in part) that is more restrictive than the limitations that would apply under the State law generally applicable to the entity in the absence of the restriction."

Respondent argues that both partnership agreements contain provisions limiting the ability of a partner to liquidate that are more restrictive than the default Texas partnership provisions. Specifically, respondent points to section 9.2 of the partnership agreements, which provides that each partnership shall continue for a period of 35 years. Respondent also points to section 9.3 of the partnership agreements, which prohibits a limited partner from withdrawing from the partnership or from demanding the return of any part of a partner's capital account except upon termination of the partnership.

Respondent compares sections 9.2 and 9.3 of the partnership agreements with section 6.03 of the Texas Revised Limited Partnership Act (TRLPA). TRLPA section 6.03 provides:

> A limited partner may withdraw from a limited partnership at the time or on the occurrence of events specified in a written partnership agreement and in accordance with that written partnership agreement. If the partnership agreement does not specify such a time or event or a definite time for the dissolution and winding up of the limited partnership, a limited partner may withdraw on giving written notice not less than six months before the date of withdrawal to each general partner * * *.

Tex. Rev. Civ. Stat. Ann. art. 6132a-1, sec. 6.03 (West Supp. 1993).

Respondent's argument is essentially the same as the argument we rejected in Kerr v. Commissioner, 113 T.C. 449, 469-474 (1999). In Kerr, the taxpayers and their children formed two

family limited partnerships with identical liquidation restrictions. Shortly after formation, the taxpayers transferred limited partnership interests to their children by gift. On their Federal gift tax return, the taxpayers claimed substantial discounts in the value of the interests compared to the value of the underlying assets due to lack of control and lack of marketability. The partnership agreements provided that the partnerships would continue for 50 years.

The Court held:

Respondent's reliance on TRLPA section 6.03 is misplaced. TRLPA section 6.03 governs the withdrawal of a limited partner from the partnership--not the liquidation of the partnership. TRLPA section 6.03 sets forth limitations on a limited partner's withdrawal from a partnership. However, a limited partner may withdraw from a partnership without requiring the dissolution and liquidation of the partnership. In this regard, we conclude that TRLPA section 6.03 is not a "limitation on the ability to liquidate the entity" within the meaning of section 25.2704-2(b), Gift Tax Regs.

Id. at 473. In sum, the Court concluded that the partnership agreements in Kerr were not more restrictive than the limitations that generally would apply to the partnerships under Texas law. See id. at 472-474. Respondent acknowledges that Kerr is applicable to this issue but argues that Kerr was incorrectly decided. However, we find no reason to reach a result that is different than the result in Kerr. Thus, section 2704(b) does

not apply here.  See also <u>Knight v. Commissioner</u>, 115 T.C. 506, 519-520 (2000); <u>Harper v. Commissioner</u>, T.C. Memo. 2000-202.

<u>Valuation of Decedent's Gifts of</u>
<u>Limited Partnership Interests</u>

A gift of property is valued as of the date of the transfer. See sec. 2512(a).  The gift is measured by the value of the property passing from the donor, rather than by the property received by the donee or upon the measure of enrichment to the donee.  See sec. 25.2511-2(a), Gift Tax Regs.  The fair market value of the transferred property is the price at which the property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.  See <u>United States v. Cartwright</u>, 411 U.S. 546, 551 (1973); sec. 25.2512-1, Gift Tax Regs.  The hypothetical willing buyer and the hypothetical willing seller are presumed to be dedicated to achieving the maximum economic advantage.  See <u>Estate of Davis v. Commissioner</u>, 110 T.C. 530, 535 (1998).  Transactions that are unlikely and plainly contrary to the economic interests of a hypothetical willing buyer or a hypothetical willing seller are not reflective of fair market value.  See <u>Estate of Strangi v. Commissioner</u>, 115 T.C. 478, 491 (2000); <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. 193, 232 (1990); <u>Estate of Hall v. Commissioner</u>, 92 T.C. 312, 337 (1989).

As is customary for valuation issues, the parties rely extensively on the opinions of their respective experts to support their differing views about the fair market value of the gifts of partnership interests. The estate relies on Elliott, a senior member of the American Society of Appraisers and a principal in the business valuation firm of Howard Frazier Barker Elliott, Inc. Respondent relies on Francis X. Burns (Burns), a candidate member of the American Society of Appraisers and a principal in the business valuation firm of IPC Group, Inc. Each expert prepared a report.

We evaluate the opinions of the experts in light of the demonstrated qualifications of each expert and all other evidence in the record. See Estate of Davis v. Commissioner, supra at 536. We are not bound by the formulae and opinions proffered by expert witnesses, especially when they are contrary to our judgment. Instead, we may reach a determination of value based on our own examination of the evidence in the record. Where experts offer contradicting estimates of fair market value, we decide what weight to give those estimates by examining the factors used by the experts in arriving at their conclusions. See id. Moreover, because valuation is necessarily an approximation, it is not required that the value that we determine be one as to which there is specific testimony, provided that it is within the range of figures that properly may

be deduced from the evidence.  See <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.  The experts in this case agree that, in ascertaining the fair market value of each gift of interest in the partnerships, one starts with the fair market value of the underlying assets of each partnership and then applies discounts for factors that limit the value of the partnership interests.

A.  <u>Nature of Interests Transferred</u>

The first argument of the estate is that the partnership interests that were transferred by decedent were assignee interests rather than limited partnership interests.  The estate claims that decedent and the recipients of the gifts did not fulfill the necessary requirements set forth in the partnership agreements for transferring limited partnership interests.  The JBLP agreement provides that, upon an exchange of an interest in the partnership, the general partner and 100 percent of the remaining limited partners must approve, in writing, of a transferred interest becoming a limited partnership interest.  The AVLP agreement provides that the general partners and 75 percent of the limited partners must approve, in writing, of a transferred interest's becoming a limited partnership interest.  Because these written approvals were not carried out, the estate contends that the recipients of the gifts are entitled only to the rights of assignees.

In Kerr v. Commissioner, 113 T.C. 449, 464 (1999), the taxpayers held greater than 99 percent of the partnership interests of two family limited partnerships as general and limited partners. The taxpayers' children held the remaining partnership interests, totaling less than 1 percent of overall ownership, as general partners. The partnership agreements provided that no person would be admitted as a limited partner without the consent of all general partners. In 1994, the taxpayers transferred a large portion of their limited partnership interests to trusts for which they served as trustees. At trial, the taxpayers argued that, although they made these transfers to themselves as trustees, pursuant to the family limited partnership agreement, their children as general partners had to consent to the admission of the trustees as limited partners. The taxpayers argued that the interests held by the trusts should be valued as assignee interests. The Court looked at all of the surrounding facts and circumstances in holding that the interests that were transferred by the taxpayers were limited partnership interests. See id. at 464.

On review of the facts and circumstances of the case at hand, decedent, like the taxpayers in Kerr, transferred limited partnership interests to his children rather than assignee interests. The evidence shows that decedent intended for the transfers to include limited partnership interests and that the

children consented to the transfer of limited partnership interests, having waived the requirement of a writing.

Pursuant to the AVLP agreement, Susan Jones Miller and Elizabeth Jones as general partners would have had to consent in writing to the transfer of the interests as limited partnership interests.  Also, 75 percent of the remaining limited partners, i.e., Elizabeth Jones, Susan Jones Miller, Kathleen Jones Avery, Lorine Jones Booth, and decedent, would have had to consent in writing.  Pursuant to the JBLP agreement, A.C. Jones as general partner would have had to consent in writing to the transfer as a limited partnership interest.  Also, all of the remaining limited partners, i.e., A.C. Jones and decedent, would have had to consent in writing.

Although the estate argues that the absence of written consents leads to the conclusion that the interests transferred were assignee interests, it is difficult to reconcile that position with the language that decedent, his children, and Elliott used to document and characterize the transfers.  First, the documents entitled "Gift Assignment of Limited Partnership Interest", created by decedent to carry out the transfers, state that, after the transfers are complete, each child will hold his or her newly acquired interest as a "limited partnership interest".  Second, in his 1995 Federal gift tax return, decedent describes the gifts as "limited partnership interests" rather

than assignee interests.  Third, in an affidavit executed on January 12, 1999, A.C. Jones states that the gifts that he and his sisters received from decedent were "limited partnership interests".  Fourth, the 1995, 1996, 1997, and 1998 Federal income tax returns for JBLP and AVLP, signed by A.C. Jones and Elizabeth Jones, respectively, designate the interests as limited partnership interests on the Schedules K-1.  Fifth, although he claimed at trial that he was valuing assignee interests, Elliott's written report referred only to limited partnership interests.  These factors lead to the conclusion that the estate's argument, that decedent transferred assignee interests, was an afterthought in the later stages of litigation.

Also, after giving the gifts to his daughters, decedent was left with a 20.518-percent limited partnership interest.  Section 5.4 of the AVLP agreement was modified so that consent of 85 percent of the partners was required in order for a general partner to sell a real estate interest belonging to the partnership.  With this modification, decedent could retain the power to block unilaterally a sale of a real estate interest even after giving the gifts.  This amendment would not have been necessary if the daughters had received only assignee interests.

This case is distinguishable from Estate of Nowell v. Commissioner, T.C. Memo. 1999-15, relied on by petitioner.  In Estate of Nowell, the partnership agreements specified that the

recipient of limited partnership interests would become an assignee and not a substitute limited partner unless the general partners consented to the assignee's admission as a limited partner.  The Court there decided that interests in the partnerships should be valued for estate tax purposes as assignee interests rather than as limited partnership interests.

The transactions in Estate of Nowell differ from the gifts in the case at hand in that the beneficiaries, the estate, and the decedent in Estate of Nowell never treated the passing interests in the partnerships as limited partnership interests. The record was void of evidence that showed that a limited partnership interest was in fact transferred.  Here, the conduct of decedent, A.C. Jones, and the daughters reflects that limited partnership interests were actually transferred by decedent.

B.  Value of the Transferred Interest in JBLP

Having concluded that decedent transferred an 83.08-percent limited partnership interest in JBLP to A.C. Jones, the next issue for decision is the value of the limited partnership interest.  The estate relies on the conclusions of Elliott, who opined that the value of the interest in JBLP is subject to a secondary market discount of 55 percent, a lack-of-marketability discount of 20 percent, and an additional discount for built-in capital gains.  Respondent relies on the valuation of Burns, who opined that no discounts apply.

Section 9.4 of the JBLP agreement provides that a general partner may be removed at any time by the act of the partners owning an aggregate 51-percent interest in the partnership. After removal, if no general partners remain, the limited partners shall designate a successor general partner. If the limited partners fail to designate a successor general partner within 90 days, the partnership will dissolve, affairs will be wound up, and the partnership will terminate.

Section 9.4 effectively gives ultimate decision-making authority to the owner of the 83.08-percent limited partnership interest. Under the threat of removal of the general partner, the 83.08-percent limited partner would have the power to control management, to compel a sale of partnership property, and to compel partnership distributions. If the general partner refused, the 83.08-percent limited partner could force liquidation within 90 days. Having the ability to force liquidation also gives the 83.08-percent limited partner the right to force a sale of the partnership assets and to receive a pro rata share of the NAV. Because the 83.08-percent limited partner has the power to control the general partner or to force a liquidation, the discounts proffered by Elliott are unreasonable and unpersuasive. The size of the interest to be valued and the nature of the underlying assets make the secondary market an improbable analogy for determining fair market value.

We do not believe that a seller of the 83.08-percent limited partnership interest would part with that interest for substantially less than the proportionate share of the NAV.

Burns opined that no discount for lack of control should apply for the reasons stated above. We agree. He also concluded that "the size and the associated rights of the interest would preclude the need for a marketability discount." He recognized that section 8.4 of the partnership agreement purported to give family members the power to prevent a third-party buyer from obtaining an interest in the JBLP, but he maintained that "to adhere to the fair market value standard, an appraiser must assume that a market exists and that a willing buyer would be admitted into the partnership." We believe that there is merit to this position. Self-imposed limitations on the interest, created with the purpose of minimizing value for transfer tax purposes, are likely to be waived or disregarded when the owner of the interest becomes a hypothetical willing seller, seeking the highest price that the interest will bring from a willing buyer. The owner of the 83.08-percent interest has the ability to persuade or coerce other partners into cooperating with the proposed sale. Nonetheless, liquidation of a partnership and sale of its assets, the most likely threat by which the owner of such a controlling interest would persuade or coerce, would involve costs and delays. The possibility of litigation over a

forced liquidation would reduce the amount that a hypothetical buyer would be willing to pay for the interest. See Adams v. United States, 218 F.3d 383 (5th Cir. 2000); Estate of Newhouse v. Commissioner, 94 T.C. 193, 235 (1990). A marketability discount would apply, but we believe that, under the circumstances of this case, an 8-percent discount more accurately reflects reality. This amount approximates the discount for lack of marketability proposed by Burns with respect to AVLP, as discussed below.

The experts also disagree about whether a discount attributable to built-in capital gains to be realized on liquidation of the partnership should apply. The parties and the experts agree that tax on the built-in gains could be avoided by a section 754 election in effect at the time of sale of partnership assets. If such an election is in effect, and the property is sold, the basis of the partnership's assets (the inside basis) is raised to match the cost basis of the transferee in the transferred partnership interest (the outside basis) for the benefit of the transferee. See sec. 743(b). Otherwise, a hypothetical buyer who forces a liquidation could be subject to capital gains tax on the buyer's pro rata share of the amount realized on the sale of the underlying assets of the partnership over the buyer's pro rata share of the partnership's adjusted basis in the underlying assets. See sec. 1001. Because the JBLP

agreement does not give the limited partners the ability to effect a section 754 election, in this case the election would have to be made by the general partner.

Elliott opined that a hypothetical buyer would demand a discount for built-in gains. He acknowledged in his report a 75- to 80-percent chance that an election would be made and that the election would not create any adverse consequences or burdens on the partnership. His opinion that the election was not certain to be made was based solely on the position of A.C. Jones, asserted in his trial testimony, that, as general partner, he might refuse to cooperate with an unrelated buyer of the 83.08-percent limited partnership interest (i.e., the interest he received as a gift from his father). We view A.C. Jones' testimony as an attempt to bootstrap the facts to justify a discount that is not reasonable under the circumstances.

Burns, on the other hand, opined, and respondent contends, that a hypothetical willing seller of the 83.08-percent interest would not accept a price based on a reduction for built-in capital gains. The owner of that interest has effective control, as discussed above, and would influence the general partner to make a section 754 election, eliminating any gains for the purchaser and getting the highest price for the seller. Such an election would have no material or adverse impact on the preexisting partners. We agree with Burns.

Petitioner relies on Eisenberg v. Commissioner, 155 F.3d 50 (2d Cir. 1998), revg. T.C. Memo. 1997-483, and Estate of Davis v. Commissioner, 110 T.C. 530, 546-547 (1998). Those cases, however, are distinguishable. In the contexts of those cases, the hypothetical buyer and seller would have considered a factor for built-in capital gains in determining a price for closely held stock in a corporation. In Eisenberg, the Court of Appeals emphasized that earlier Tax Court cases declining to recognize a discount for unrealized capital gains were based on the ability of the corporation, under the doctrine of General Utilities & Operating Co. v. Helvering, 296 U.S. 200 (1935), to liquidate and distribute property to its shareholders without recognizing built-in gain or loss and thus circumvent double taxation. The Court of Appeals went on to explain that the tax-favorable options ended with the Tax Reform Act of 1986, Pub. L. 99-514, sec. 631, 100 Stat. 2085, 2269. In reversing our grant of summary judgment on this issue and remanding the case for determination of gift tax liability, the Court of Appeals cited and quoted from Estate of Davis v. Commissioner, supra, in support of its reasoning.

In Estate of Davis, the Court rejected the Government's argument that no discount for built-in capital gains should apply because of the possibility that the corporation could convert to an S corporation and avoid recognition of gains on assets

retained for 10 years.  Applying the hypothetical buyer and seller test, the Court, based on the record presented, including the testimony of experts for both parties, concluded that a discount for tax on built-in gains would be applied.

In the cases in which the discount was allowed, there was no readily available means by which the tax on built-in gains would be avoided.  By contrast, disregarding the bootstrapping testimony of A.C. Jones in this case, the only situation identified in the record where a section 754 election would not be made by a partnership is an example by Elliott of a publicly syndicated partnership with "lots of partners * * * and a lot of assets" where the administrative burden would be great if an election were made.  We do not believe that this scenario has application to the facts regarding the partnerships in issue in this case.  We are persuaded that, in this case, the buyer and seller of the partnership interest would negotiate with the understanding that an election would be made and the price agreed upon would not reflect a discount for built-in gains.

C.  Value of Interests in AVLP

The estate relies on the conclusions of Elliott, who opined that the value of each transferred interest in AVLP is subject to a secondary market discount of 45 percent, a discount for lack of marketability equal to 20 percent, and an additional discount for built-in capital gains.  Burns opined that the transferred

interests are entitled to a secondary market discount of 38 percent, a discount for lack of marketability equal to 7.5 percent, and no discount for built-in capital gains.

An owner of a 16.915-percent limited partnership interest in AVLP does not have the ability to remove a general partner. As such, a hypothetical buyer would have minimal control over the management and business operations. Also, a 16.915-percent limited partnership interest in AVLP is not readily marketable, and any hypothetical purchaser would demand a significant discount. In calculating the overall discount for the AVLP interests, both experts use data from different issues of the same publication regarding sales of limited partnership interests on the secondary market. The publication was the primary tool used by both experts.

Burns, using the May/June 1995 issue, opined that interests in real estate-oriented partnerships with characteristics similar to AVLP traded at discounts due to lack of control equal to 38 percent on January 1, 1995. The May/June 1995 issue contained data regarding the sale of limited partnership interests during the 60-day period ended May 31, 1995. Burns classified AVLP as a low-debt partnership making current distributions.

Elliott, using the May/June 1994 issue, opined that similar partnerships traded at a secondary market discount of 45 percent. The secondary market discount is an overall discount encompassing

discounts for both lack of control and lack of marketability for minority interests in syndicated limited partnerships.  The May/June 1994 issue contained data regarding the sale of limited partnership interests during the 60-day period ended May 31, 1994.

The estate argues that Burns' conclusion, which is based on data found in the May/June 1995 issue, is flawed because such information was not available on January 1, 1995, the date the gift was made.  The estate contends that, since a gift of property is valued, pursuant to section 2512(a), as of the date of the transfer, posttransfer data cannot affect our decision.  However, Burns does not use the posttransfer data to prove directly the value of the transferred interests.  Instead, he uses the May/June 1995 issue to show what value would have been calculated if, on January 1, 1995, decedent had looked at transactions involving the sale of interests in similarly situated partnerships occurring at that point in time.  Data regarding such transactions involving similarly situated partnerships were available on the valuation date.  Therefore, the data available in the May/June 1995 issue are relevant as they provide insight into what information would have been found if, on January 1, 1995, decedent had looked at transactions occurring on or near the valuation date.

The data on which Burns relied show that interests in similarly situated partnerships were trading at a 38-percent discount from April 2 to May 31, 1995.  The data on which Elliott relied show that interests in similarly situated partnerships were trading at a 45-percent discount from April 2 to May 31, 1994.  Therefore, transfers of interests on or around January 1, 1995, would have been trading at a discount somewhere between 38 and 45 percent.  Because the data on which Burns relied are closer in time to the transfer date of the 16.915-percent AVLP interests, we give greater weight to his determination.  Recognizing that the valuation process is always imprecise, a 40-percent discount is reasonable.  This discount is a reduction in value for an interest trading on the secondary market and encompasses discounts for lack of control and lack of marketability.

Elliott opines that an additional 20-percent discount for lack of marketability is applicable because the partnerships that are the subject of the data in the publication are syndicated limited partnerships.  He believes that, although there is a viable market for syndicated limited partnership interests, a market for nonsyndicated, family limited partnership interests does not exist.  The additional 20-percent discount opined by Elliot is also attributable to sections 8.4 and 8.5 of the AVLP agreement, which attempt to limit the transferability of

interests in AVLP.  In calculating the additional discount, Elliott relied on data found in various restricted stock and initial public offering studies.

Elliott acknowledges that the secondary market for syndicated partnerships is not a strong market and that a large discount for lack of marketability is already built into the secondary market discount.  Although Elliott adjusts his analysis of the data found in the restricted stock and initial public offering studies to take into consideration the lack-of-marketability discount already allowed, his adjustment is inadequate.  His cumulation of discounts does not survive a sanity check.

Sections 8.4 and 8.5 of the AVLP agreement do not justify an additional 20-percent discount.  An option of the partnership or the other partners to purchase an interest for fair market value before it is transferred to a third party, standing alone, would not significantly reduce the value of the partnership interest.  Nevertheless, the right of the partnership to elect to pay the purchase price in 10 annual installments with interest set at the minimum rate allowed by the rules and regulations of the Internal Revenue Service would increase the discount for lack of marketability.  Texas courts have been willing to disregard option clauses that unreasonably restrain alienation.  See Procter v. Foxmeyer Drug Co., 884 S.W.2d 853, 859 (Tex. App.

1994). We express no opinion whether this election is enforceable under Texas law. Because this clause would cause uncertainty as to the rights of an owner to receive fair market value for an interest in AVLP, a hypothetical buyer would pay less for the partnership interest. See Estate of Newhouse v. Commissioner, 94 T.C. 193, 232-233 (1990); Estate of Moore v. Commissioner, T.C. Memo. 1991-546. We believe that an additional discount equal to 8 percent for lack of marketability, to the NAV previously discounted by 40 percent, is justified.

For the reasons set forth in the built-in capital gains analysis for JBLP, an additional discount for lack of marketability due to built-in gains in AVLP is not justified. Although the owner of the percentage interests to be valued with respect to AVLP would not exercise effective control, there is no reason why a section 754 election would not be made. Elliott admits that, because AVLP has relatively few assets, a section 754 election would not cause any detriment or hardship to the partnership or the other partners. Thus, we agree with Burns that the hypothetical seller and buyer would negotiate with the understanding that an election would be made. Elliott's assumption that Elizabeth Jones and Susan Jones Miller, as general partners, might refuse to cooperate with a third-party purchaser is disregarded as an attempt to bootstrap the facts to justify a discount that is not reasonable under the

circumstances.  Therefore, a further discount for built-in capital gains is not appropriate in this case.

D.  Conclusion

The schedules below summarize our conclusions as to fair market value for the transferred JBLP and AVLP limited partnership interests:

83.08-Percent Interest in JBLP

| | |
|---|---|
| NAV of limited partnership | $ 7,704,714 |
| | 83.08% |
| Pro rata NAV | 6,401,076 |
| Lack of marketability (8%) | (512,086) |
| Fair market value | $ 5,888,990 |

16.915-Percent Interest in AVLP

| | |
|---|---|
| NAV of limited partnership | $11,629,728 |
| | 16.915% |
| Pro rata NAV | 1,967,168 |
| Secondary market (40%) | (786,867) |
| | 1,180,301 |
| Lack of marketability (8%) | (94,424) |
| Fair market value | $ 1,085,877 |

We have considered all remaining arguments made by both parties for a result contrary to those expressed herein, and, to the extent not discussed above, they are irrelevant or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.